IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-30635
_____


FALGOUT BROTHERS, INC.,

                                        Plaintiff-Appellant,

versus

HOUSTON CASUALTY COMPANY,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court for
the Eastern District of Louisiana
(USDC No. 99-CV-3527-S)
_____
March 14, 2003


Before REAVLEY, JOLLY and JONES, Circuit Judges.

PER CURIAM:[*]

    Falgout Brothers, Inc. ("Falgout Brothers") sued Houston Casualty Company

("Houston Casualty"), its hull and machinery insurer, for damage to its barge, the

CHERAMIE-104.  The district court determined that a preponderance of the

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion
should not be published and is not precedent except under the limited circumstances
set forth in 5TH CIR. R. 47.5.4.

evidence demonstrated that the damage resulted from the barge's wasted and deteriorated condition, and not from running aground. As the insurance contract did not provide coverage for damages caused by deterioration, the district court found in favor of Houston Casualty, and this appeal followed.

Falgout Brothers claims that the district court erred by not finding that Houston Casualty waived its defense of noncoverage, and that the district court's factual findings regarding the cause of the damage were clearly erroneous. We affirm.

## Background

On January 6, 1993, the CHERAMIE-104 left Mobile, Alabama bound for San Juan, Puerto Rico. The barge was being lease-purchased by Falgout Brothers and had been chartered by Falgout Brothers' subsidiary, Caribe U.S.A., Inc., to carry lumber, paper, and steel products. The barge was in tow of the tug NEPTUNE, owned by Dann Ocean Towing.

On January 10, 1993, the crew of the NEPTUNE noted that the barge had developed a port stern list and took it to Key West for survey and repair. On January 12, 1993, the Caribe port captain, Henry Bailey, Jr., the maintenance manager for R&B Falgout Marine, examined the barge and found that it had a crack on the port stern skeg, but was unable to ascertain the cause of the crack. Resolve

Towing & Salvage, Inc. assisted in the repair of the barge, and in a January 20, 1993 letter to Falgout Brothers, the president of Resolve Towing referred to the cracks as "stress cracks."

Bailey testified that his inspection of the barge's port bow rake compartment on January 12 revealed no holes, no fractured or bent internal frame members, no water, and no gravel or rocks in the compartment. On January 19, 1993, the CHERAMIE-104 arrived in San Juan without any list, water in the barge, flooding, or other problems. The barge unloaded its deckhouse cargo and departed San Juan January 21, 1993 in the tow of the NEPTUNE. Neither Henry Bailey, Jr., nor any other representative of Falgout Brothers, was aboard the NEPTUNE for this portion of the voyage.

On January 29, 1993 the NEPTUNE's log notes that the draft on the port bow of the CHERAMIE-104 had increased from two to five feet. The barge was far from any shore at that time. The logs do not contain any notation that either the tug or the barge had run aground. On January 31, 1993, the CHERAMIE-104 arrived at Ocean Marine Contractors in Morgan City, Louisiana, where extensive repairs were performed. Some of the repairs were necessary to prepare the barge for upcoming inspections by the American Bureau of Shipping ("ABS").

In Morgan City, the barge was surveyed by Bailey, Gran Burton (a marine

3

surveyor retained by Carbide), and Norman DuFour (a marine surveyor retained by Dann Ocean Towing). Five feet of water was found in the port bow rake compartment. After pumping the water, the surveyors found a fracture in the bottom of the barge measuring two inches wide by twelve inches long. The bottom plating in the center bow compartment was indented three inches over and area measuring six feet by eight feet, and the bottom plating in the #1 port compartment was damaged its full length and width. After the port bow rake compartment was pumped dry, the surveyors agreed that the compartment contained gravel and rocks, which had not been presented when Bailey inspected the compartment in Key West three weeks earlier.

Falgout Brothers sent a Report of Loss of Hull to its broker on February 4, 1993, and the notice was received by Houston Casualty on February 9, 1993. The Report of Loss of Hull informed Houston Casualty that a casualty occurred at an unknown location while the barge was in tow of the NEPTUNE. The Report stated that Falgout Brothers did not expect to file a claim but would seek full recovery from Dann Ocean Towing. Although the policy required Falgout Brothers to give Houston Casualty notice of the February 4, 1993 joint survey "where practicable," Falgout Brothers did not notify their broker of the joint survey until it had been completed.

4

Houston Casualty took no action in response to the Report of Loss of Hull until May 27, 1994, when it engaged marine surveyor Jules Schubert to review documents, including various surveys by Burton and Dufour, invoices from various repair facilities, ABS surveys, the logs of the NEPTUNE, and an on-charter report prepared by Anthony Brown in 1991. On May 15, 1995, Schubert issued a report stating that the documents he reviewed were not sufficient to present a clear picture of what happened to cause the damage, but at least some portions of the barge were in poor condition.

Houston Casualty then turned the claim over the consultants Richards, Hogg, Lindley, who retained H. Bennison of Richards Consulting Engineers. Richard Wood, president of Richards, Hogg, Lindley, testified that Houston Casualty provided his company with the reports of Burton, DuFour, ABS, and Brown. Bennison generated a report on February 19, 1997. The report noted allegations of wastage but opined that the damage was caused by a single event, which was probably either a grounding, contact with a submerged object, or heavy weather encountered during the voyage, all perils covered under the insurance contract at issue. The record does not reveal what documents Bennison considered, as he did not testify at trial.

On May 28, 1998, Houston Casualty approved the claim filed by Falgout

Brothers in the amount of $48,611.88, which was repair cost approved in the report of Richard, Hogg, Lindley. After applying the deductible of $25,000, Houston Casualty paid Falgout Brothers $23,611.88. Falgout accepted this as partial payment of its claim, and reserved the right to seek the unpaid balance of $188,638.12 from Houston Casualty. Houston Casualty made no reservation of its rights, including the right to contest coverage.

After negotiations between Falgout Brothers and Houston Casualty failed to resolve whether $48,611.88 was the reasonable cost of repairs, Falgout Brothers filed suit for breach of the insurance contract seeking the unpaid balance of the claim in Louisiana state court. Houston Casualty removed the case to federal court and filed an answer, which pleaded "all policy defenses, terms and conditions and exclusions as if pleaded herein in extenso," but did not otherwise mention the defense of noncoverage. It was not until a Pre-Trial Order filed August 3, 2000 that Houston Casualty specifically raised the coverage issue.

A two-day bench trial was held before the Honorable Henry A. Mentz, Jr. in August, 2000. The parties submitted post-trial briefs and the case was taken under submission. On April 23, 2001, the case was allotted to Judge Mary Ann Vial Lemmon. The parties agreed to submit the matter on the transcript and post-trial briefs. On June 7, 2002, Judge Lemmon entered judgment in favor of Houston

6

Casualty and dismissed Falgout Brothers' claim.  On June 20, 2002, Falgout filed

timely notice of this appeal.

**Waiver**

"Waiver" is generally understood as the intentional relinquishment of a

known existing legal right.  Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508

So. 2d 1371, 1373 (La. 1987) (citations omitted).  The requirements of waiver under

Louisiana law are an existing right, knowledge of its existence, and either actual

intention to relinquish it or conduct so inconsistent with the intent to enforce it as to

induce a reasonable belief that the right has been relinquished.  Id. at 1374.  The

burden of proving an insurer's waiver of a right, power, or privilege to avoid

liability is on the party asserting it.  Id. at 1375.

Falgout Brothers relies on Employers Mutual Liability Insurance Co. v. Sears,

Roebuck & Co. for the proposition that "[a]n insurer's settlement with a claimant, if

entered voluntarily and with knowledge of facts indicating noncoverage, waives the

insurer's defense of noncoverage of the insured . . . unless the insurer otherwise

protects its defenses."  621 F.2d 746, 747 (5th Cir. 1980) (citing 16A J. APPLEMAN,

INSURANCE LAW AND PRACTICE § 9366, at 826 (1968)).  In Employers Mutual, we

held that an insurance company's settlement of a products liability claim against a

vendor (insured through an endorsement of the manufacturer's policy) operated as a

waiver where the insurer entered into the settlement with knowledge of possible negligence on the part of the vendor but failed to reserve its right to contest coverage. The insurer assumed the defense of the vendor, settled the claim, and then sought contribution and indemnity. The court determined the insurer waived its right to contest coverage by failing to protect its rights though reservation, a nonwaiver agreement, or a declaratory judgment action.

The Employers Mutual court noted that the doctrine of waiver through settlement with a claimant is based upon "the apparent conflict of interest that might arise when the insurer represents the insured in a lawsuit against the insured and simultaneously formulates its defense against the insured for noncoverage." Id. at 747 (quoting Pacific Indem. Co. v. Acel Delivery Serv., Inc., 485 F.2d 1169, 1173 (5th Cir. 1973)). In Louisiana, "[w]aiver principles are applied stringently to uphold the prohibition against conflicts of interest between the insurer and the insured which could potentially affect legal representation in order to reinforce the role of the lawyer as the loyal advocate of the client's interest." Steptore v. Masco Constr. Co., 643 So.2d 1213, 1216 (La. 1994).

These principles are inapplicable in the instant case. Houston Casualty did not assume the defense of Falgout Brothers without a timely reservation of rights and then later seek to deny coverage, as in Steptore and Peavy Co. v. M/V ANPA,

8

971 F.2d 1168, 1175-76 (5th Cir. 1992).  Nor did it settle with a third-party claimant and then seek contribution and indemnity from its insured, as in Employers Mutual.  In those cases, the interests of the insured and its insurer were aligned against a third party before the insurer sought to deny coverage, creating a conflict of interest.  In the present case, no such conflict exists.

Even assuming the circumstances justified application of the waiver doctrine, an insurer's payment of a certain amount to its insured would only waive the insurer's right to deny coverage in that amount.  Houston Casualty does not seek a refund of that payment, and it is free to contest excess damages on the basis that those damages were not caused by a covered peril.

Although the district court should have considered Falgout Brothers' waiver argument, its failure to do so was harmless as Houston Casualty has not waived its right to contest coverage for damages in excess of its initial payment.

**The Cause of the Damage to the Barge**

The district court found that Falgout Brothers failed to prove that the loss resulted from an insured peril.  We review a district court's factual findings for clear error and its legal conclusions de novo.  A finding of fact is clearly erroneous when the reviewing court is left with a "definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395

9

(1948).

Falgout Brothers contends that the presence of rocks and pebbles in the bottom of the barge during the joint survey establishes that the barge ran aground, and thus the district court erred by giving more weight to the opinions of surveyors who did not participate in the joint survey and who opined the rocks were rust scale based on their examination of photographs of the barge.

The district court's findings that the debris in the bottom of the barge was rust scale coated with grey-colored silt residue is not clearly erroneous. Schubert testified that, based upon his examination of photographs, the debris appeared to be rust scale. Dufour testified that, although he has no specific recollection of the debris, he must have seen it during his survey of the barge and did not consider it significant evidence of grounding. This suggests that the debris may have indeed been rust scale, and the district court was not unreasonable in accepting this explanation in light of the record as a whole.

Falgout Brothers contends the district court's finding was erroneous because Schubert admitted that someone at the joint survey, such as Burton or Bailey, would be in a better position to determine precisely what the debris was. However, the district court judge was entitled to view the findings of Burton and Bailey with suspicion because Falgout Brothers failed to notify Houston Casualty of the joint

10

survey.  See Delta Marine Drilling Co. v. M/V Baroid Ranger, 454 F.2d 128, 130

(5th Cir. 1972).  We cannot say the district court's decision to give less weight to

the findings of Burton than to those of Schubert or DuFour was clearly erroneous.

AFFIRMED.