889 So.2d 1104 (2004)
CUGINI, LTD., dba Andrea's Restaurant
v.
ARGONAUT GREAT CENTRAL INSURANCE COMPANY.
No. 04-CA-795.
Court of Appeal of Louisiana, Fifth Circuit.
November 30, 2004.
*1106 Patrick C. Kelley, Metairie, LA, for Plaintiff/Appellant.
John W. Waters, Jr., David E. Walle, New Orleans, LA, for Defendant/Appellee.
*1107 Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA, and SUSAN M. CHEHARDY.
JAMES L. CANNELLA, Judge.
The Plaintiff, Cugini, Ltd. (Cugini), d/b/a Andrea's Restaurant (Andrea's), appeals from a judgment on a claim for water damage against its insurer, Argonaut Great Central Insurance Company. We amend and affirm as amended.
The Defendant provided a standard commercial insurance policy to the Plaintiff, a restaurant located in Metairie, Louisiana and owned and operated by Chef Andrea Apuzzo (Chef Andrea). The policy was in effect from November 30, 2000 to November 31, 2001. On June 28, 2001, the Plaintiff discovered water seeping into its parking lot from an outside grease trap, a piece of equipment that filters greasy water flowing from the kitchen before going into the sewer pipe under the building. The Plaintiff immediately notified its insurance agent, John O'Brien (O'Brien) of Powell Insurance Agency, who went to the site and observed the water leaking around the trap. He immediately contacted the Defendant, though its claims manager in Illinois, James Ketchum (Ketchum) to see if the damage was covered. Based on the information at the time, Ketchum approved repairs. O'Brien instructed the Plaintiff to get a plumber to the site and an estimate. The Plaintiff contacted Dr. Pipe Plumbing (Dr. Pipe), which provided a written "estimate" before knowing exactly what would be required to fix the leak. The document was faxed to O'Brien. The document did not give a total estimated cost for the repairs, but described how much various items or labor would be charged if needed. Dr. Pipe then determined that the pipes under the building had broken, releasing sewer water into the soil. The water saturated the ground around the grease trap, causing the grease trap to tip over and break. On June 29, 2001, the Defendant sent an independent adjuster to evaluate the damage. He spoke to the Defendant's claims manager on July 3rd and issued a report on July 5, 2001, indicating that the damage was extensive. On July 17, 2001, the adjuster sent a civil engineer to inspect the damage to determine the cause of the problem. He concluded that the broken pipes that caused the water overflow were corroded from age.
On July 24, 2001, the Plaintiff received an invoice from Dr. Pipe for $31,576.00. The claim was then submitted to the Defendant. While waiting for the Defendant to pay the claim, the Plaintiff paid Dr. Pipe for the repairs. On October 1, 2001, the Defendant denied the claim, explaining that the policy excluded damage related to underground pipes. The Plaintiff responded with a letter disputing the Defendant's interpretation of the policy, again requesting payment of the claim. The Defendant again denied the claim.
The Plaintiff filed suit against the Defendant on December 17, 2001 to recover the costs of the repairs, as well as penalties and attorney's fees under La.R.S. 22:658 and 22:1220. The Plaintiff alleged that the Defendant specifically authorized the repairs on June 28, 2001, that the Plaintiff detrimentally relied on the authorization, that other provisions in the policy overrode the policy exclusions, and that the Defendant acted in bad faith in denying the claim.
A bench trial was held on September 22, 2003. At its conclusion, the trial judge found that the broken underground pipes had deteriorated over time and that the insurance policy did not cover underground pipe repairs and replacement. However, the trial judge requested memoranda briefing the issues of whether the replacement of the grease trap was covered under the policy and whether the *1108 principles of waiver and estoppel applied to provide coverage for the underground pipes. On October 30, 2003, the trial judge rendered a judgment in favor of the Plaintiff for $4,000 for the cost of replacing the grease trap only. Motions for New Trial filed subsequently were denied in November of 2003.
On appeal, the Plaintiff contends that the trial judge erred in failing to award the full amount of the claim. The Plaintiff further contends that the trial judge erred in failing to find that the Defendant acted in bad faith and was therefore subject to punitive damages and/or any other damages/penalties as provided in La.R.S. 22:658 and 22:1220. Third, the Plaintiff asserts that the trial judge erred in failing to find the Defendant arbitrary and capricious in failing to pay the claim.
O'Brien testified that when he went to the Plaintiff's site to observe the damages, he saw that a hole had been dug around the grease trap and that the trap was cracked and had tilted to the right. Water was pouring from under the building, eroding the soil away from the trap. He told Chef Andrea that he had to get it fixed to stop the leaking water. Chef Andrea wanted to know if the insurance would cover it. O'Brien was not sure. So, the two men went into the office and looked at the insurance policy. O'Brien still could not tell if it was covered and called the Defendant's Illinois office to find out. He was referred to Ketchum, the claims manager for Louisiana. Chef Andrea was in the room during the conversation. O'Brien told Ketchum that it looked like a broken pipe eroded some dirt under the grease trap, that they did not know where the water was coming from, and that the trap was on its side. He asked if the damages would be covered. According to O'Brien, "He said, yeah, go ahead, broken pipes are covered. Go ahead and have it fixed." O'Brien then told Chef Andrea to collect estimates and get the work going to have the problem fixed. The property loss notice he sent to the Defendant on that day states that the water eroded the soil under the grease trap causing the trap to shift and crack, and that the building needed a new grease trap.
When Chef Andrea received the estimate from Dr. Pipe, he gave it to O'Brien, who faxed it to Ketchum on July 5, 2001. That document did not state a total amount for the work, nor did it estimate the amount of work to be done. It listed standard industry costs for tunneling into the ground, breaking concrete, excavation, pipe and hanger repair and replacement, fill, and debris removal. According to Steve Chambers (Chambers), owner of Dr. Pipe, until the job commenced, there was no way to know how much the project would cost.
O'Brien went to the scene a week or so after his initial visit. At that time, he became concerned about the extent of the claim, because there was a lot of activity around the site. Several large trucks were parked in the lot and a number of workers were pumping mud from under the building as they tunneled. To him, it was a much larger job than thought on the day of the leak. O'Brien immediately used his cell phone to call Moulton Adjusting Services (Moulton) to alert the company to the fact that the job was getting extensive and to make sure they were "on top of this claim." He left a voice message. He did not have any further communication with Ketchum or anyone at Moulton. However, he told Chef Andrea to hurry with the bills and send them to the adjuster as soon as possible. At the end of July, O'Brien was informed for the first time that there were coverage problems and that the claim was denied, but the work, which took approximately four weeks, had already been completed by then.
*1109 On August 7, 2001, O'Brien sent a note to Ketchum. In that note, O'Brien reminded Ketchum that he had told the insured that the break up of the slab was covered and further reminded him that the grease trap was broken. O'Brien asked that at least some part of the claim be covered and to address the specific provisions in the policy rejecting coverage, as the insured would be bringing it to his attorney to review. In a form letter dated September 27, 2001, O'Brien was provided a status update which stated that the claim was closed and no money had been paid out. In early October, he received a copy of the letter officially denying the claim.
O'Brien noted that insurance companies do not deny or accept a claim until after they finish the investigation, look at the claim or get an initial report. In this case, after informing them that the claim was more extensive than originally thought, he would have expected someone to come out and look at it. O'Brien stated that the job took almost a month to complete. In any event, no one told Chef Andrea that there might be a coverage problem until after the work was completed. All of this time Chef Andrea was under the impression that the bill for the repairs would be paid.
Ketchum testified that he received a phone call from O'Brien on June 28, 2001, informing him that there was a water leak coming up through the floor and that a broken pipe was causing the water to come up into the kitchen. Ketchum talked to O'Brien in general about what the policy would cover. He said that he explained that it would cover the cost of "tear-out" of part of a building to get to the pipe, but that the pipe itself would not be covered. He thought that the damage was small and told O'Brien that the deductible was $2,500. When asked if he told O'Brien to proceed with the work, Ketchum said "Sure, I told him about the general coverage, and he can decide what he wants to do." He further testified that he was not sure about what was going on at the site since he was not there, but was led to believe that there was a pipe in the slab that was broken. He stated "in fact, the policy would cover (sic) to tear out (sic) to get to the pipe if it was in the slab." He said that he found out soon after that that was not the fact and that there were underground sewer pipes that had deteriorated and apparently caused water to seep into the kitchen. He noted that the Loss Notice prepared by O'Brien that he received on that day soon after his conversation with O'Brien states that the water pipe in the slab broke causing water to leak through and that "the water has eroded the soil under the grease trap causing the trap to shift and crack. Needs new grease trap." He was not sure, but thought the water damage was only in the kitchen, and did not know if the grease trap was in or outside the building. However, he later found out from the adjuster and the civil engineer that the problem was a deteriorated underground pipe, which he contended is not covered by the policy.
After talking to O'Brien on June 28, 2001, Ketchum assigned an independent adjuster, Moulton, to go to the site. Gary Noble (Noble), one of the adjusters went to the restaurant on June 29, 2001, the next day. On or about July 3rd, he verbally reported that the plumber was excavating under the building, that the tunnel job was going to be rather extensive, that Dr. Pipe was doing the work, that the cast iron pipe was deteriorated, and that it appeared that all of the pipe would have to be replaced. Ketchum received a written report from Noble on July 5, 2001, estimating the repair cost at around $20,000, and further noting that there was a problem with the grease trap.
*1110 Ketchum testified that did not tell the Plaintiff or O'Brien to stop the work after talking to the adjuster on July 3rd or after receiving the report on July 5th. He did not talk to either Chef Andrea or O'Brien until after the work was completed. He received a fax from O'Brien on July 31, 2001 with a copy of the invoice for the cost of the repairs. On the bottom, Ketchum wrote that he had spoken to "Moulton" and was told that Dr. Pipe had been going to the restaurant for five years for problems with the sewerage pipes. On August 7, 2001, Ketchum received a fax from O'Brien informing Ketchum that `we' told Chef Andrea that the break-up of the floor slab to get at the pipe was covered. He stated that this was incorrect because the floor was not being broken up. In addition, O'Brien requests in the fax that some part of the claim be covered. On September 26, 2001 a note was sent to O'Brien indicating that the file was closed. He could not remember when and if he had spoken to O'Brien about denying the claim before September. Ketchum testified that over the course of working with the Defendant, he had a number of claims of this type from Powell, O'Brien's agency.
Chambers testified that he had performed work for Chef Andrea in the past and was still doing so. When he arrived and saw the problem with the water seepage and grease trap, he was told to start work. He thought the insurance was going to pay for the job. Chambers stated that he knew from past experience that there was a sewer pipe problem under the building because of previous work on another section of the building and because of the building's age (30 to 40 years). He had relayed this information to Chef Andrea in the past. Chambers testified however, that this was the first time he had seen water in that particular spot.
Chambers stated that in a job like this, where the problem is unknown, it is like "opening a can of worms." So, he could not tell in the beginning how large the job was going to be. Chambers noted that he estimates the cost of a job by the foot at a set rate for that type of job in the industry. Chambers noted that the estimate he provided on the first day is a standard proposal, and that the invoice showed the actual costs of the job.
Chambers described the scene on June 28th, stating that "stinky" kitchen or greasy wastewater was flowing out from under the building. Chambers explained that both kitchen and sewer water flows into the sewer pipe under the building. The kitchen water drains down through the foundation into an underground pipe to a grease trap, where it is filtered before traveling into the sewer pipes. An independent company periodically cleans the grease trap. Here, the kitchen water seeped into the parking lot because the trap was tilted over due to the subsidence of the saturated ground around it. The subsidence was caused from water escaping the broken underground pipes over a period of time. Chambers noted that as the workers tunneled and followed the pipe, they discovered that the whole plumbing system needed to be repaired due to deterioration from age, and that the repairs included more than one pipe. He stated that a plumber is obligated by code to fix any broken pipe they might find as a job proceeds.
Chambers testified that he was never informed that the work would not be covered by the insurance. He found out after the job was completed. He did not see any adjusters on the site, but he was not there all of the time since his brother actually did the work. Peter Chambers, the actual plumber on the job and Steve Chambers' brother, did see someone, apparently the engineer, at site asking questions. He was never told that the job was *1111 not covered by the policy, but Peter Chambers noted that the person was only obtaining information.
Noble testified that Ketchum initially told him that the slab was broken and that there was water damage. He went to the site on June 29, 2001. He saw some laborers pumping water and sludge out of a hole near the back door of the kitchen. He did not see any tunneling or pipes that had been removed. He did not speak to Chef Andrea because he had been told to talk to O'Brien who was not there. Noble tried to talk to the workers, but they spoke little English. He did not return, but he called the plumber who gave him the details about the job. Noble then called Ketchum. Noble told Ketchum that someone else should look at the job to verify what the plumber told Noble.
James Wilbourn, a civil engineer and expert in evaluating the cause of failure of structures, including commercial structures and sewer systems and foundations, testified that he was hired by Moulton to evaluate the Plaintiff's water seepage problem. He inspected the site on July 17, 2001. When he arrived, the majority of the underground pipes had been removed and were lying on the ground. The new pipes had not yet been installed. He said that the cast-iron pipes and hangers were severely corroded from age. He noted that the building was approximately 30 years old and that corrosion would have started almost immediately. Wilbourn testified that water will flow through gradually corroding pipes until, over time, the bottom of the pipe disintegrates, creating jagged edges on the bottom. As solid items, such as toilet paper and food pass through, they catch on the jagged edges and blockages develop. The blockages, in turn, cause the water to flow out of the pipes into the soil. In this case, the deteriorated condition of the pipes would not allow the water to flow properly.
Chef Andrea, the president of Cugini, was told of the leak by a worker and his wife Kathleen Apuzzo, the Vice-President of the company and office manager for the restaurant at the time. When O'Brien arrived, Chef Andrea asked O'Brien if the damage would be covered because he did not understand the policy and relied on the agent to tell him whether to proceed with the repairs. Based on the conversation between O'Brien and Ketchum, he understood that the Defendant authorized the work, so he contacted Dr. Pipe and told Chambers to proceed. No one told him at any time after the initial approval that the claim would not be covered under the policy because it involved underground pipe repairs. Kathleen Apuzzo also testified that no one informed them that the damage would not be covered during the progress of the work. Chef Andrea said that he relied on the initial authorization by the Defendant to his detriment. He contended that he would not have had the work done at that time, if he had known that he was going to have to pay for the repairs himself. He felt that the repairs would have been done, but "down the way," explaining that the summer restaurant business was slow financially and he could have neutralized the odors with chemicals as a temporary measure. Chef Andrea stated that he paid the plumber before the claim was denied, because Chambers was asking for payment, but that he had to pay $30,000 of the bill in installments, with the balance in restaurant trade.

THE POLICY PROVISIONS
An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code. Cadwallader v. Allstate Ins. Co., 02-1637, p. 3 (La.6/27/03), 848 So.2d 577, 580. The judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to *1112 the contract. See La.C.C. art. 2045; Cadwallader, 02-1637 at 3, 848 So.2d at 580.
Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. See La.C.C. art. 2047; Cadwallader, 02-1637 at 3, 848 So.2d at 580. An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms to achieve an absurd conclusion. Cadwallader, 02-1637 at 3, 848 So.2d at 580. The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clarity the parties' intent. Cadwallader, 02-1637 at 4, 848 So.2d at 580.
Ambiguous policy provisions are generally construed against the insurer and in favor of coverage. La.C.C. art. 2056; Cadwallader, 02-1637 at 4, 848 So.2d at 580. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. Cadwallader, 02-1637 at 4, 848 So.2d at 580. The strict construction principle applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations. Id. For the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable. Cadwallader, 02-1637 at 4, 848 So.2d at 580.
If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written. Id. Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms. Cadwallader, 02-1637 at 4, 848 So.2d at 580. The determination of whether a contract is clear or ambiguous is a question of law. Cadwallader, 02-1637 at 4, 848 So.2d at 580,
The Defendant contends that the policy does not provide coverage for the underground pipes. The Defendant asserts that Monju v. Continental Cas. Co., 487 So.2d 729, 731 (La.App. 5th Cir.1986) is on all fours with this case that underground pipes are clearly and unambiguously not covered property. See also: Tonti Realty Corp. v. Travelers Indem. Co. of Illinois, 2001 WL 969115 (E.D.La. Aug.23, 2001). The Defendant cites the following provisions:
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
A. COVERAGE
We will pay for direct physical loss of or damage to Covered Property ... or resulting from any Covered Cause of Loss.
...
2. Property Not Covered
...
f. The cost of excavations, grading, backfilling or filling;
g. Foundations ... below:
...
(2) The surface of the ground....
h. Land ...;
...
m. Underground pipes, flues or drains;
CAUSES OF LOSS  SPECIAL FORM
...
B. EXCLUSIONS
...

*1113 2. We will not pay for loss ... caused by ...
d. (1) Wear and tear;
(2) Rust, corrosion, fungus, decay, deterioration ...;
....
f. Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.
....
3. We will not pay for loss ... caused by any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay ...
....
c. Faulty, inadequate or defective:
....
(4) Maintenance
The Plaintiff asserts that the damage to the pipes is either specifically covered, the exclusions are overridden by other parts of the policy, or the policy contradicts itself and is ambiguous.
The Plaintiff first cites the "Property Covered" provision under the BUILDING AND PERSONAL PROPERTY COVERAGE FORM, 1.a.(2), which states that the policy provides coverage for a "building," including additions, fixtures, machinery and appliances. He contends that the plumbing system is part of the building and should be covered. The Plaintiff asserts that coverage is also provided in the CAUSES OF LOSS  SPECIAL FORM section under D. ADDITIONAL COVERAGE  COLLAPSE, and E. ADDITIONAL COVERAGE EXTENSIONS, which state:
D. ADDITIONAL COVERAGE  COLLAPSE
We will pay for loss ... caused by ... from risks ... involving collapse of a building or any part of a building caused by ...
1. The "specified causes of loss" ...
F. DEFINITIONS
"Specified Causes of Loss' means ... water damage.
...
3. Water damage means accidental discharge or leakage of water ... as the direct result of the breaking or cracking of any part of a system or appliances containing water or steam.
E. ADDITIONAL COVERAGE EXTENSIONS
....
2. Water Damage ... If loss ... caused by or resulting from covered water ... occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water ... escapes.

We note that there is an endorsement under the BUILDING AND PERSONAL PROPERTY COVERAGE FORM, Section A.  COVERAGE, Item 5  Coverage Extensions, which extends coverage to damage to "Covered Property" (a "building," including additions, fixtures, machinery and appliances) caused by water that backs up from a sewer or drain.
We first note that the Monju case is not dispositive of our case. There, the Court cited two policy provisions to determine if the policy was ambiguous. Here, we are concerned with several other provisions neither discussed nor apparently contained in the policies in Monju. In this case, the policy has additional coverage and coverage extension provisions that conflict with the non-covered and exclusion sections and is susceptible to two reasonable interpretations. Thus, we conclude that the provisions of the policy are ambiguous and that the trial judge erred in finding that the policy does not provide coverage for the replacement and repair costs to the plumbing system.

*1114 WAIVER, EQUITABLE ESTOPPEL AND DETRIMENTAL RELIANCE
We also find coverage based on the conduct of the Defendant. The Plaintiff asserts that the Defendant waived the no coverage defense, or is equitably estopped from asserting the defense by its conduct in this case. The Plaintiff also raised the issue of its detrimental reliance due to the initial authorization to fix the broken pipe. The Defendant responds that the coverage is determined by the written terms of the contract and cannot be extended or enlarged even by an agent's representations, citing La.R.S. 22:628 and Sharff v. Ohio Cas. Ins. Co., 605 So.2d 657, 661 (La.App. 2nd Cir.1992).
Waiver is generally understood to be the intentional relinquishment of a known right, power or privilege or conduct, so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished. Tate v. Charles Aguillard Ins. & Real Est., 508 So.2d 1371, 1375 (La.1987); Steptore v. Masco Construction Company, Inc., 93-2064 (La.8/18/94), 643 So.2d 1213, 1284.
In Tate, rendered after the enactment of La.R.S. 22:628, the Louisiana Supreme Court stated that waiver by an insurer may apply to any provision of an insurance contract under which the insurer knowingly and voluntarily elects to relinquish his right, power or privilege to avoid liability, even though the effect may bring within coverage risks originally excluded or not covered. Tate, 508 So.2d at 1375. See also: State Farm Mut. Auto. Ins. Co. v. Cooper, 97-1134, p. 5 (La.App. 3rd Cir.2/18/97) 707 So.2d 986, 989.[1] In Cooper, the court explained:
The rationale for this authority has been traced to the common law doctrine ... and in Louisiana contemplates both cases where the issue has been cast as one of insurance "coverage" or one of an insured's "forfeiture" of insurance. Indeed, even an insurer's provision of legal defenses has been found to constitute an insurer's waiver of the coverage issue. An alternate basis for finding coverage in such circumstances has been the ground of negligent misrepresentation, it being the expressed opinion of the Louisiana Supreme Court that La.Civ.Code art[s]. 2315 and 2316 are sufficiently broad to encompass a cause of action for negligent misrepresentation. [Citations omitted]
Thus, the Plaintiff can assert a claim of waiver or equitable estoppel in its dispute with the Defendant. However, reliable proof of a knowing and voluntary waiver is necessary and the burden of producing it, as in the proof of obligations, generally falls on the party who demands performance. Id.
An insurer is charged with the knowledge of the contents of its own policy. Steptore, 643 So.2d at 1215. Notice of facts which would cause a reasonable person to inquire further imposes a duty of investigation upon the insurer. Id. An insurer's failure to investigate constitutes a waiver of all powers or privileges which a reasonable search would have uncovered. Steptore, 643 So.2d at 1216.
Equitable estoppel, or "estoppel in pais," can be defined as the effect of the voluntary conduct of a party whereby he is barred from asserting rights against another party who justifiably relies on such conduct and who has changed his position to his detriment as a result of such reliance. Wilkinson v. Wilkinson, 323 So.2d 120, 126 (La.1975). There are three elements of estoppel: (1) a representation by conduct or word, (2) justifiable reliance, and (3) a change in position to *1115 one's detriment because of the reliance. Id.[2]
Similarly, in order to recover damages for detrimental reliance, the party must prove (a) the existence of a promise and (b) reasonable reliance on that promise to the party's detriment. Magic Moments Pizza, Inc. v. Louisiana Restaurant Ass'n, 02-160, p. 5 (La.App. 5th Cir.5/29/02), 819 So.2d 1146, 1149.
The Defendant here received an oral report from the adjuster a few days after the claim was brought to its attention. The report warned that there was a great deal of activity at the site and that the job appeared to be larger than originally described to Ketchum. Two days later on July 5, 2001, Ketchum received a copy of the adjuster's written report and Dr. Pipe's document detailing the standard costs for tunneling, pipe replacement and the related expenses. At that time, the Defendant was put on notice that the damage was more expansive than one small broken pipe and a damaged grease trap. In addition, the Defendant knew that the Plaintiff was proceeding with the work and relying on the Defendant's authorization. However, it chose not to warn the Plaintiff or O'Brien that the work might not be covered under the policy.
Based on the evidence, we conclude that Defendant's conduct constituted a waiver because it was "so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." Cadwallader, 02-1637 at 4, 848 So.2d at 580. In addition, the evidence shows that the Plaintiff relied on the Defendant's authorization on June 28, 2001 to its detriment. These facts satisfy the proof necessary for equitable estoppel or detrimental reliance. Thus, we find that the trial judge was manifestly erroneous in failing to find coverage under waiver, equitable estoppel or detrimental reliance.
Accordingly, the judgment of the trial court awarding damages in the amount of $4,000 is hereby amended to raise the award to $31,576, with an offset in favor of the Defendant for the deductible amount of $2,500. The judgment is otherwise affirmed. Costs of this appeal are to be paid by the Defendant.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] Writ denied, 98-0684 (La.5/1/98), 718 So.2d 409 and 98-0713 (La.5/1/98), 718 So.2d 412.
[2] In Tate, the District Court referred to the issue of equitable estoppel, but the Louisiana Supreme Court only discussed the question of waiver.