969 So.2d 755 (2007)
Daniel ARCENEAUX, Louis Daverede, Jr., Vives Lemmon, and Jules Menesses
v.
AMSTAR CORP., Amstar Sugar Corp., Tate & Lyle North American Sugars, Inc., and Domino Sugar Company.
No. 2006-CA-1592.
Court of Appeal of Louisiana, Fourth Circuit.
October 31, 2007.
Rehearing Denied November 28, 2007.
*760 Daniel L. Dysart, Dysart & Tabary, L.L.P., Chalmette, LA, and Lee M. Epstein, Fried & Epstein, LLP, Philadelphia, PA, for Defendant/Appellee, Tate and Lyle North American Sugars, Inc.
Glenn G. Goodier, Jones Walker Waechter Poitevent Carrere & Denegre, L.L.P., New Orleans, LA, for Continental Casualty Company.
(Court composed of Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS, JR.)
PATRICIA RIVET MURRAY, Judge.
This is a complex insurance coverage dispute. The underlying action is a cumulated tort suit by almost three hundred present and former employees of Tate & Lyle North American Sugars, Inc. ("Tate & Lyle"),[1] who sued Tate & Lyle for occupational hearing loss. The underlying action has been settled. This appeal arises out of Tate & Lyle's third party demand against its general liability insurer, Continental Casualty Insurance Company ("Continental"), for indemnity of the settlement awards, defense costs, and bad faith penalties. From a multimillion-dollar judgment in favor of Tate & Lyle, Continental appeals. The primary issues on this appeal relate to the scope of the waiver of policy defenses that results when an insurer assumes the defense of its insured without securing a non-waiver agreement or issuing a reservation of rights declaration.

FACTUAL AND PROCEDURAL BACKGROUND
On February 2, 1999, four plaintiffs commenced this suit against Tate & Lyle as a cumulated action under La. C.C.P. art. 463. The plaintiffs alleged that they were exposed to unreasonably loud noise in the course of their employment with Tate & Lyle at its Domino Sugar Refinery in Arabi, Louisiana. The period of alleged tortious exposure was "various times between 1947 and 1994." In response, Tate & Lyle retained the Lamothe & Hamilton law firm (the "Lamothe Firm") to defend it.
*761 Continental insured Tate & Lyle under eight general liability insurance policies covering bodily injury occurring between 1963 and 1978. Based on those policies, Tate & Lyle notified Continental in March 1999 of this suit. In May 1999, Continental retained the law firm of Galloway, Johnson, Burr & Smith (the "Galloway Firm") to defend Tate & Lyle. Thereafter, the Galloway Firm enrolled as co-counsel with the Lamothe Firm in this suit.
In April 2001, the plaintiffs filed a First Supplemental and Amending Petition. The first amending petition added about one hundred and thirty new plaintiffs. In February 2003, the law firm of Rabalais, Unland & Lorio (the "Rabalais Firm") became Tate & Lyle's sole defense counsel.
Due to the large number of cumulated plaintiffs, the trial court decided to try this case in flights of about fifteen plaintiffs.[2] Given the plaintiffs' stipulation that their individualized damages did not exceed the $50,000 jury trial threshold, a bench trial was scheduled on the first flight for May 5, 2003. At that time, neither Continental nor any other insurer of Tate & Lyle was named as a defendant. On May 9, 2003, the trial was suspended to allow for settlement negotiations. On that same date, Tate & Lyle, without Continental's consent, settled with the first flight of plaintiffs for $35,000 each (a total of $525,000). In its May 14, 2003 letter to plaintiffs' counsel memorializing the settlement agreement, the Rabalais Firm requested that the settlement be kept confidential because Tate & Lyle was "attempting to negotiate with several insurance companies." On May 29, 2003, Tate & Lyle first notified Continental of the settlement.
On June 6, 2003, Continental made a written offer to contribute $50,000 towards the settlement of the first flight. On that same date, Continental issued a disclaimer letter to Tate & Lyle.[3] In that letter, Continental disclaimed coverage based on certain exclusions in its policies for employer's liability and workmen's compensation (hereinafter referred to as the employee exclusions).[4] In that letter, Continental reserved its right to disclaim coverage to the extent that "[t]he alleged bodily injury did not take place during one or more of the Continental Casualty policy periods," and stated that its reservation of rights extended to any "future litigation regarding these policies." At that point, Continental withdrew from the defense. Shortly thereafter, Continental was joined as a third party defendant by Tate & Lyle and as a direct defendant by the plaintiffs.
In its third party demand against Continental, which was filed on July 11, 2003, Tate & Lyle sought (i) indemnification for the amounts it is required to pay in this case; (ii) defense costs; and (iii) bad faith penalties under La. R.S. 22:658.[5]
The plaintiffs filed their Second and Third Supplemental and Amending Petitions on August 26, 2003, and April 28, 2004, respectively. In these petitions, new defendants, including Continental, were *762 added,[6] and about one hundred and sixty new plaintiffs were added. (The plaintiffs who were added in these petitions, which were filed after Continental disclaimed coverage and issued its reservation of rights letter, are referred to as the post-denial plaintiffs). In these petitions, the plaintiffs extended the period of alleged tortious exposure from "various times between 1947 and 1994" to "various times between 1939 and present."[7]
On October 29, 2004, the trial court granted Tate & Lyle's motion for partial summary judgment on its third party demand against Continental. Agreeing with Tate & Lyle, the trial court found that Continental waived its right to deny coverage based on the employee exclusions in its policies by participating in Tate & Lyle's defense for a period of four years without securing a non-waiver agreement or providing Tate & Lyle with a reservation of rights declaration. However, the trial court limited its decision to "only those cases for which coverage is provided as a result of the policies issued for the periods of time set forth in the insurance contracts or policies," which is from 1963 to 1978 (Continental's policy period). The trial court certified its partial summary judgment as a final judgment for purposes of appeal under La. C.C.P. art. 1915.
In Arceneaux v. Amstar Corp., 05-0177 (La.App. 4 Cir. 12/14/05), 921 So.2d 189 ("Arceneaux I"), we affirmed the trial court decision. While Continental's appeal in Arceneaux I was pending in this court, the trial court set the second flight of fifteen plaintiffs for trial. Shortly before the scheduled trial date, Tate & Lyle announced in open court on April 14, 2005 that it had settled the claims of not only the second flight of plaintiffs, but also of all the remaining plaintiffs. The second flight of plaintiffs was settled on the same basis as the first flight; the fifteen plaintiffs in that flight received $35,000 each. As to the remaining plaintiffs, Tate & Lyle entered into a matrix settlement agreement. Under that agreement, the remaining plaintiffs likewise would be deemed eligible to receive $35,000 each if they met certain settlement criteria. The claims of plaintiffs that did not meet the criteria would be dismissed.
Shortly before the announcement of the settlements, on April 1, 2005, the trial court denied the cross-motions for summary judgment that were filed by Tate & Lyle and Continental seeking a determination regarding the scope of Continental's waiver of its policy defenses. The principal issues the parties raised in the cross-motions and in this appeal are two-fold: (i) whether Continental's waiver expanded the period of Continental's coverage beyond its policy period  the fifteen years (1963 to 1978) for which it issued policies; and (ii) whether Continental's waiver applies to the post-denial plaintiffs  the plaintiffs who were not included in the original and first amended petitions.
As to the issue of whether Continental's waiver extended to its policy period, the court denied summary judgment, reasoning that neither side had cited any jurisprudential authority directly addressing that issue. As to Continental's contention that it had not waived any defenses with regard to the post-denial claims, the trial *763 court stated in its April 1, 2005 reasons for judgment that "the amended and supplemental petitions relate to the original and first amended Petitions." Also in its reasons for judgment, the trial court recognized that its earlier decision, rendered October 29, 2004 (the decision this court affirmed in Arceneaux I), provided for the following three things: (i) it recognized Tate & Lyle's right to recover past defense expenses from Continental; (ii) it required Continental to undertake the defense of the plaintiffs' entire claim; and (iii) it required Continental to indemnify Tate & Lyle from any loss which may have been occasioned by the plaintiffs' claims due to the policies of insurance that were issued by Continental to Tate & Lyle from 1963 to 1978.
Trial on Tate & Lyle's third party demand against Continental began on August 22, 2005, and concluded on August 25, 2005. At trial, Tate & Lyle's sole witness was its corporate representative, Bobbi Claypool. Ms. Claypool was one of the Tate & Lyle claims managers who handled this claim. Continental presented four witnesses: (i) Linda Graft, Continental's claims consultant who handled this claim;[8] (ii) Daniel Caswell, Continental's corporate representative; (iii) Dr. Herbert Marks, an expert in the field of otolaryngology (the study of the diseases of the ear and throat); and (iv) Dr. Michael Seidemann, a specialist in the field of audiology. The parties also introduced hundreds of documents. The trial court, with the consent of the parties, left the record open at the end of the trial for the purpose of filing supplemental settlement closing documents consisting of releases, receipts, and indemnity agreements. In its reasons for judgment, the trial court stated that, after the filing of these supplemental settlement documents, there were two hundred and seventeen plaintiffs from whom closing settlement documents had been secured and who had been paid by Tate & Lyle.[9]
The filing of post-trial memoranda was delayed as a result of Hurricane Katrina, which made landfall four days after the trial was concluded. Before the post-trial memoranda were filed, this Court rendered its decision in Arceneaux I, which, as noted above, affirmed the partial summary judgment rendered in favor of Tate & Lyle. Because Continental did not file an application for rehearing with this Court or a writ application with the Louisiana Supreme Court, this decision became a final judgment in January 2006. See La. C.C.P. art. 2166(A).
On April 7, 2006, the trial court rendered judgment in favor of Tate & Lyle in the amount of $9,646,875 plus legal interest and costs. On April 21, 2006, the trial court rendered an amended judgment in the amount $9,848,542.33 together with legal interest thereon from the date of judicial demand until paid and for all costs of these proceedings.[10] The trial court held *764 that Continental was liable for the following: (i) indemnification for the settlements with two hundred and seventeen (217) plaintiffs (one hundred and sixteen (116) post-denial plaintiffs and one hundred and one (101) pre-denial plaintiffs) totaling $7,595,000 ($35,000 times 217); (ii) penalties under La. R.S. 22:658, as amended in August 2003, for 25% of the $7,595,000 in indemnity and the $1,419,168.95 in defense costs already paid by Continental,[11] for a total penalty of $2,253,543; and (iii) legal interest from the date of judicial demand. This appeal followed.

DISCUSSION
On appeal, Continental raises multiple assignments of error. For purposes of discussion, we have grouped the issues it raises into the following five categories: (1) waiver, (2) reasonableness of settlements, (3) proffer, (4) bad faith penalty, and (5) pre-judgment interest. We separately address each category.

WAIVER
As noted above, the trial court previously rendered partial summary judgment holding that, by providing an unconditional defense to Tate & Lyle for four years, Continental waived its coverage defense based upon the employee exclusions in its policies. However, the trial court's previous ruling, which we affirmed,[12] was specifically limited to those claims that allegedly occurred during the policy period.[13]
In the judgment at issue on this appeal, the trial court materially expanded its prior decision by finding that the scope of Continental's waiver included waiving the enforcement of its policy period as well as waiving its right to assert the employee defense or to limit coverage to its policy period to the claims of the post-denial plaintiffs. On appeal, Continental contends that the trial court's expansion of its prior decision was error. Because Continental's waiver of its policy period is a separate issue from the waiver of its right to decline coverage to the post-denial plaintiffs, we discuss each issue in turn.
(i) waiver of policy period
The trial court's finding that Continental waived its right to enforce its policy period has two components: (i) a legal finding that a policy period is a defense that can be waived, and (ii) a factual finding that Continental waived this defense. To the extent this is a factual finding, it is governed by the manifest error standard of review. Canter v. Koehring Co., 283 So.2d 716 (La.1973); see also 14 Couch on Ins.3d § 202:58 (noting that [t]he determination of whether an insurer has waived any coverage or other policy defenses by defending the insured without a reservation of rights as to those defenses often involves questions of fact.)
*765 To provide a framework for addressing the trial court's findings, we briefly summarize the two Louisiana Supreme Court cases that address the issue of waiver in the insurance context: Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508 So.2d 1371 (La.1987); and Steptore v. Masco Constr. Co., 93-2064 (La.8/18/94), 643 So.2d 1213; as well as the one federal case the trial court relies upon, North American Capacity Ins. Co. v. Brister's Thunder Karts, Inc., 287 F.3d 412, 417 (5th Cir.2002).
In Tate, the Louisiana Supreme Court conducted an extensive review of the jurisprudence from other states, and rejected the then majority view that waiver cannot be invoked to broaden coverage to include risks not included or expressly excluded from the insurance contract. Instead, the Court concluded that "the best view is that waiver may apply to any provision of an insurance contract under which the insurer knowingly and voluntarily elects to relinquish his right, power or privilege to avoid liability, even though the effect may bring within coverage risks originally excluded or not covered." Tate, 508 So.2d at 1375. Nevertheless, the Court cautioned that "reliable proof of such knowing and voluntary waiver is necessary and the burden of producing it, as in the proof of obligations, generally falls on the party who demands performance." Id.
In Steptore, the Court reaffirmed the principle it enumerated in Tate that any policy provision can be waived and further defined the proof required to establish a waiver. In that case, the plaintiff, who was injured on a crane barge, sued the barge owner and its insurer, Ocean Marine. Ocean Marine's policy included a navigation warranty that the barge would be located in St. John the Baptist Parish. Shortly before the accident, the insured moved the barge to Ascension Parish. The plaintiffs petition alleged that the accident occurred in Ascension Parish, putting Ocean Marine on notice of its insureds breach of the navigation warranty, which provided a defense to coverage under the Ocean Marine policy. Despite knowledge of this coverage defense, Ocean Marine unconditionally defended the claim for six months before denying coverage.
As the Louisiana Supreme Court framed the issue, it granted certiorari to decide whether Ocean Marine waived its right to deny coverage by unconditionally assuming and continuing its insured's defense despite having knowledge of facts indicating that the insured had violated the policy's warranty provision. Citing Tate for the proposition that waiver is the "intentional relinquishment of a known right," the Court concluded that "when an insurer, with knowledge of facts indicating non-coverage under the insurance policy, assumes or continues the insured's defense without obtaining a non-waiver agreement to reserve its coverage defense, the insurer waives such policy defense." Steptore, 93-2064, at p. 5, 643 So.2d at 1216. Considering the facts presented, the Court found that Ocean Marine had waived its coverage defense, reasoning:
[I]t is undisputed that Ocean Marine did not reserve its right to deny coverage under the policy prior to assuming the defense of Masco [ (the insured) ]. Nor did Ocean Marine provide Masco separate counsel in order to avoid a potential conflict of interest. Accordingly, because the insurer assumed the defense without reserving its rights or otherwise protecting its interests and continued to represent the insured when its own interests were adverse to the insured, we find that Ocean Marine waived any coverage defense it may have had under the policy.
*766 Steptore, 93-2064 at p. 5, 643 So.2d at 1216.
Relying on Steptore, the federal court in Brister's found the insured waived its right to enforce any coverage defenses, including its policy period. In that case, the insured, Brister's, failed to report its claim to its insurer, North American, until more than one year after the policy period had expired. North American therefore was put on notice that there was no coverage under the policy.[14] Nevertheless, it appointed counsel to represent itself and its insured, and waited three years before asserting that there was no coverage. The federal court reasoned that [b]ecause North American assumed Bristers defense without reserving its rights or otherwise protecting its interest, it waived any coverage defense it may have had under its policy with Bristers. Bristers, 287 F.3d at 417 (citing Steptore, supra).
With that background in mind, we turn to the issue presented in this case of whether the trial court erred in finding Continental waived its right to enforce its policy period. Continental contends, as it did in the trial court, that its policy period is not a policy defense but rather is analogous to a policy limit, which the jurisprudence has held is not waived when an insurer unconditionally assumes an insured's defense.[15] Tate & Lyle counters, and the trial court found, that a policy period is distinguishable from a policy limit. We agree. "An insurer should not be obligated, at the inception of every lawsuit, to go through the exercise of including a rote statement that a judgment might exceed the policy limit." 1 Allan Windt, Insurance Claims & Dispute, Representation of Insurance Companies and Insureds, § 2:14 (5th ed. 2007)("Windt"); see also Faber v. Roelofs, 311 Minn. 428, 442, 250 N.W.2d 817, 825 (1977)(finding "[t]he prejudice presumed when the insured surrenders control of his defense to the insurer does not act as to eliminate the policy limits.") Our research revealed no authority, nor did Continental cite any, for treating a policy period like a policy limit for purposes of waiver. To the contrary, in Brister's the federal court found the policy period was waived.
Relying on Brister's, the trial court found that "Continental, by its action in defending Tate and Lyle for four (4) years may have waived the policy term as well as the exclusion right to deny coverage for claims that fell within the scope of the employees exclusion." Continental contends that Bristers is distinguishable from this case in that it involves a single claim under a claims-made policy whereas this case involves multiple claims under an occurrence policy. The holding in Brister's, however, did not hinge on the type of policy or the number of claims at issue. Rather, as in Steptore, the holding hinged on the insurer's failure to provide its insured with timely notice of its policy defense.
We, therefore, find no error in the trial court's conclusion that there is no authority for a distinction or difference in the defense that is based on an exclusion and one that is based on a specified policy *767 period. See Steptore, 93-2064 at p. 4, 643 So.2d at 1216 (citing Tate, supra) (stating that "waiver may apply to any provision of an insurance contract, even though this may have the effect of bringing within coverage risks originally excluded or not covered.") Our finding is buttressed, as Tate & Lyle emphasizes, by Continentals treatment of the policy period as a defense in its June 6, 2003 reservation of rights letter in which it expressly reserved its right to disclaim coverage for the hearing loss claims on the basis that "[t]he alleged bodily injury did not take place during one or more of the Continental Casualty policy periods."
Continental next contends that even assuming the trial court correctly concluded that its policy period could be waived, the evidence does not support the trial court's finding that it waived its right. The evidence in the record, Continental emphasizes, demonstrates that from the outset, Tate & Lyle tendered the claim to it as one for coverage under the eight particular policies that have the combined policy period of 1963 to 1978. Continental further emphasizes that it consistently took the position in defending this matter that its coverage was limited to exposures that occurred during its policy period. Tate & Lyle counters that the evidence supporting the trial court's finding of Continental's intent to waive its policy period is Continental's unconditionally providing a defense for four years.
In Steptore, the Louisiana Supreme Court enumerated the elements of waiver as follows: (1) an existing legal right; (2) knowledge of the existence of that right; and (3) either (a) an actual intention to relinquish the right, or (b) conduct so inconsistent with the intent to enforce the right so as to induce a reasonable belief that the right has been relinquished. Steptore, 93-2064 at p. 4, 643 So.2d at 1216. In order to support a finding of waiver of the right to enforce a policy provision, the insured must also demonstrate prejudice, either actual or presumptive, as a result of the insurer's actions. Windt § 2:10. Three different views currently exist among the jurisdictions regarding the requirement of demonstrating prejudice:
Some jurisdictions take the view that where an insurer, without reservation of rights and with actual or presumed knowledge, assumes the exclusive control of the defense of claims against the insured, it cannot thereafter withdraw and deny liability under the policy on the ground of noncoverage, prejudice to the insured by virtue of the insurer's assumption of the defense being, in this situation, conclusively presumed.
In other jurisdictions, the issue as to prejudice has been met directly, without resort to a presumption, by merely holding that the loss of the right of the insured to control and manage the defense is, in itself, prejudice without any further proof.
Under a third view, where an insurer defends an action on behalf of its insured with knowledge of [a] defense to coverage, as [a] general rule it is thereafter estopped from asserting that policy does not cover claim if the insured has demonstrated that it has been prejudiced by insurance carrier's actions.
Accordingly, if a liability insurer's defense of an action against the insured is to bar the insurer from subsequently raising the defense of noncoverage, or some other defense existing at the time of the accident, it must be shown that prejudice resulted from the insurer's conduct in defending the action against the insured, unless conflict of interest or other harm is clear and unmistakable.
14 Couch on Ins.3d §§ 202:67-69.
Although the Louisiana Supreme Court in Steptore did not expressly address the *768 prejudice requirement, it implicitly recognized that prejudice arises when a conflict of interest exists between an insurer and its insured, reasoning that "waiver principles are applied stringently to uphold the prohibition against conflicts of interest between the insurer and the insured which could potentially affect legal representation in order to reinforce the role of the lawyer as the loyal advocate of the client's interest." Steptore, 93-2064 at p. 4, 643 So.2d at 1216; see Parsons v. Continental Nat'l Am. Group, 113 Ariz. 223, 228, 550 P.2d 94, 99 (1976)(recognizing that a conflict of interest may provide the source of prejudice upon which an insured may rely to estop an insurer from denying coverage).
A prompt reservation of rights letter serves the purpose of negating the inference of a voluntary relinquishment of a known right to contest coverage. Robert Keeton, Insurance Law § 6.6 (1971). Conversely, an insurers actions in continuing to defend an insured after it acquired information relevant to a potential defense against coverage, may be thought to imply an acknowledgement of coverage despite that defense. Id. The jurisprudence has found an insurers belated disclaimer prejudicial because the insured lost its opportunity to assume and/or manage its own defense as a direct result of its reliance on the insurers assumption of the defense. 1 David Leitner, et al., Law and Prac. of Ins. Coverage Litig. § 8:11 (2007). However, there are no universally accepted rules. Id.
The Louisiana Supreme Court, in Steptore, held that an insurer who unconditionally undertakes the defense of the insured with knowledge that it has a coverage defense waives the right to enforce that defense. See 15 William Shelby McKenzie & H. Alston Johnson, Louisiana Civil Law Treatise: Insurance Law and Practice § 5 (3d Ed.2006)("McKenzie & Johnson")(citing Steptore, supra). Applying this principle to the case at bar, the trial court found that Continental waived its right to enforce its policy period. In so finding, the trial court cited numerous factors including the following:
 The belated reservation of rights occurred after the trial had commenced on the first flight of Plaintiffs on May 5, 2003 and a settlement agreement made to comprise the first flight claims for a global sum of $35,000.00 each and Continental was notified of the settlement agreement in late May, 2003.
 Upon learning of the settlement, Continental informed Tate & Lyle that they could not settle the first flight because this was CNA (Continental) money.
 Continental knew of the specific terms in their policies of insurance implicated in the lawsuit years in advance of the reservation notice, yet it took no timely action to assert those rights by apprising Tate & Lyle of their coverage defenses. Conversely, Continental took an aggressive role to defend Tate & Lyle.
 Only after the reservation notice of June 2003 did Continental inform Tate & Lyle that they were sending the coverage matter out for an opinion of insurance coverage under the Continental policies.
 Only Continental chose to defend without a reservation of rights. All the other insurers gave a reservation of rights notice preserving their right to deny coverage and, thereby, avoiding a waiver of their policy defenses.
Continentals contention that there is no evidence in the record to support the trial courts finding that it waived its right to enforce its policy period is belied by its *769 actions in providing Tate & Lyle with an unconditional defense for four years. During the time that it was defending Tate & Lyle, Continental had in its possession the facts that it needed to assert a defense based on its policy period, yet it did not advise its insured that it intended to assert that defense. Instead, for four years, it lulled Tate & Lyle into believing that their positions were completely aligned.
Given these circumstances we cannot say that the trial court was manifestly erroneous in finding Tate & Lyle met its burden of proving that Continental waived its right to enforce its policy periods.
(ii) waiver of rights as to post-denial plaintiffs
Continental's second waiver argument is that the trial court erred in ruling that its waiver of policy defenses extended to the claims asserted by the post-denial plaintiffs, who were not joined in this suit until the second and third amending petitions, which were filed in September 2003 and April 2004, respectively. Continental emphasizes that these claims were not asserted until after it had issued a reservation of rights declaration, and ceased participating in Tate & Lyle's defense.[16]
In deciding that Continental's waiver extended to claims asserted after it had disclaimed coverage, the trial court invoked the relation back theory codified in La. C.C.P. art. 1153, which affords the same "procedural posture" to plaintiffs added by amendment as is held by the original plaintiffs.[17]
The primary purpose of the relation back theory is the avoidance of prescription when an overlooked defendant or cause of action is added by amending the original petition. Although this theory has been extended to pre-judgment interest,[18] we could find no authority for extending *770 it to waiver. However, the trial court reasoned that "because of the mass joinder, it matters not whether persons were added by the second, third, or fourth supplemental petition . . . this is . . . a cause of action that is common to all the individuals in the mass joinder case." Although this reasoning would be persuasive if this were a class action, we hold that the relation back theory cannot support extending Continental's waiver of its policy defenses to these cumulated multiple claims.[19]
The relation back theory utilizes the principle of estoppel to preclude a defendant from asserting the defense of prescription, but only if certain conditions are met. This is consistent with the jurisprudence recognizing that "[w]aiver or estoppel is not favored and such claims must be examined carefully and strictly." Alexander v. Cornett, 42,147, p. 17 (La.App. 2 Cir. 7/11/07), 961 So.2d 622, 632.
In order to determine if Continental's waiver should extend to the claims of the post-denial plaintiffs it is necessary to determine if the requirements for waiver were satisfied as to those claims. Under Steptore, Tate & Lyle was required to prove that Continental assumed Tate & Lyle's defense without obtaining a non-waiver agreement or issuing a reservation of rights declaration and that Continental had "an existing right, a knowledge of its existence and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it had been relinquished." Steptore, 93-2064, p. 5, 643 So.2d at 1216.
During the four year period when Continental unconditionally provided a defense to Tate & Lyle, it was not aware of the claims of the post-denial plaintiffs. Continental had no existing or known right to deny coverage for claims that had not yet been asserted. See 17 Couch on Insurance 3d § 239.106 (noting that "[t]he term `waiver' implies a choice or an election to dispense with something of present value or to forgo some present advantage," and "the right or privilege claimed to have been waived must generally have been in existence at the time of the purported waiver.") When the post-denial plaintiffs were joined in this suit, Continental had disclaimed coverage, issued a reservation of rights declaration, and ceased providing Tate & Lyle with a defense. We conclude, therefore, that the trial court erred by extending Continental's waiver to include the claims of the post-denial plaintiffs.[20]

*771 REASONABLENESS OF SETTLEMENTS
As noted above, Tate & Lyle entered into settlements with the plaintiffs on two separate occasions. In May 2003, it settled with the first flight of plaintiffs. In April 2005, it settled with the second flight of plaintiffs. Contemporaneous with the settlement of the second flight, it reached a settlement as to the claims of the remaining plaintiffs who met certain qualifying criteria set forth in the settlement agreement. Continental contends that the trial court erred in deciding that all of these settlements  two hundred and seventeen of them  that were entered into without Continental's consent were reasonable. Continental also contends that the trial court prohibited it from introducing (and in some case proffering) evidence that Tate & Lyle had no liability for the claims it settled.
Tate & Lyle counters that the trial court correctly concluded that all the settlements it entered into were reasonable. Tate & Lyle also cites a statement by this Court contained in the decision denying Continental's writ application that "[i]t was not unreasonable, based on the allegations and evidence of a particular case, for counsel to determine that settlement was the best option to resolve litigation." This statement was dicta. Neither the denial of a writ application nor the statements expressed in such a writ denial have any precedential value.
The applicable legal principles governing this issue are not disputed. As the trial court stated in its reasons for judgment, the principles are as follows:
A settlement agreement entered into by a policy holder or insured may be enforced against the liability insurer which did not consent to the settlement if the insured shows that the settlement is made in good faith, on a reasonable basis, in a reasonable amount and, in the event of a coverage denial, coverage is found to exist. To demonstrate [the reasonableness of the settlement,] the insured need not show that he would have lost the case, but only that a reasonably prudent person would have settled the case.
See 14 Couch on Insurance 3d § 203.41 and 205.52. The trial court further noted that "[w]here a claim is based on a written contract, the insured need only establish potential, rather than actual liability." See Singleton v. United Tugs Inc., 97-1652 (La.App. 4 Cir. 3/18/98), 710 So.2d 347.
Applying these principles, the trial court found all the settlements were reasonable. In so doing, the court distinguished the standard that would have applied had this cumulated mass tort action been tried instead of being settled. If the claims had been tried, the plaintiffs would have been required to prove their individual cases, and the defendants would have been able to respond in the same manner as if the claims were not cumulated. See Thomas v. Mobil Oil Corp., 02-1904, p. 3 (La.App. 4 Cir. 3/19/03), 843 So.2d 504, 506 (noting that "[i]n a cumulated action each plaintiff presents a case and each defendant responds.") Given that the matter was not tried, the trial court reasoned that "[i]t is not necessary that the settlement be the same as a judgment or verdict that would be rendered in each individual case to be enforced against the insurer." Rather, the trial court reasoned that the settlement need only be reasonable.
The trial court noted that the settlements in this case resembled those that "would be more likely in a class action or the awards to a subclass in a class action." In finding the settlements nonetheless reasonable, the trial court reasoned:

*772 [T]he lack of individualized consideration of damages is of no significant moment in determining whether the settlements are reasonable. There has been no judicial pronouncement casting per capita global awards as unreasonable and requiring separate individualized evaluation. Conversely, the jurisprudence supports the practical settlement resolution of mass tort cases on a global or per capita basis resolution.
The trial court apparently based its decision on Associated Aviation Underwriters v. Wood, 209 Ariz. 137, 98 P.3d 572 (Ct.App.2004), which Tate & Lyle cites for the proposition that "[i]t is common practice in the settlement of a mass tort case to negotiate an overall resolution of the case rather than attempt a claim by claim resolution." In Wood, a case involving the settlement of the claims of multiple claimants, the court rejected the argument, which Continental asserts in this case, that an individualized analysis of the merits of each of the plaintiffs' case is necessary in order to determine the reasonableness of the settlement of such claim. In finding such an individualized analysis is not always necessary, the court in Wood acknowledged that "in a straightforward case involving a single plaintiff who alleges injuries arising out of a single, discrete set of facts," the determination of whether a settlement agreement with the particular plaintiff was reasonable would "hinge on the legal merits of the plaintiff's liability claims (including causation), the validity of any affirmative defenses the insured might be able to assert, and the nature and extent of the plaintiff's damages" and "[i]ndividualized evidence on all those elements presumably would be presented and considered." Wood, 209 Ariz. at 171, 98 P.3d at 606. Nonetheless, the court reasoned that "[t]he legal merits of the claimant's case, albeit important, are but one relevant factor to be considered in evaluating whether an insured's settlement is reasonable and prudent." Wood, 209 Ariz. at 172, 98 P.3d at 607. Citing United Service Auto. Ass'n v. Morris, 154 Ariz. 113, 121, 741 P.2d 246, 254 (1987), the court stated that reasonableness depends on "the facts bearing on the liability and damage aspects of claimant's case, as well as the risk of going to trial." Wood, 209 Ariz. at 172, 98 P.3d at 607.
In this case, the trial court noted in its reasons for judgment that the factors that are relevant in determining if a settlement was reasonable include the funding of the settlement to plaintiffs; the cost of presenting a defense, including future as well as past litigation costs; attorney's fees; and accumulation of legal interest on any potential award. As noted, the trial court found an analysis of these factors supported a finding that all the settlements were reasonable. In reviewing that finding, we find it necessary to divide the settlements into three groups: (i) first flight settlement, (ii) second flight settlement, and (iii) remaining plaintiffs' settlement.
(i) first flight settlement
As to the first flight settlement, Continental argues that it was unreasonable for three reasons. First, it contends the amount of the settlement was unreasonable. The settlement amount, Continental contends, was contrary to the recommendation made by Tate & Lyle's defense counsel in April 2003, one month before the settlement. The earlier recommendation was an average of $20,000 per plaintiff. According to Continental, no explanation was provided as to why the settlement value increased in less than a month to $35,000 per plaintiff. Continental also argues that the plaintiffs' stipulation that their individual damages did not exceed $50,000 further *773 establishes that it was unreasonable to settle for $35,000 per plaintiff.[21]
Second, Continental complains that there was no individualized analysis and that the individualized factors that were ignored included prescription defenses, other causes of the particular plaintiff's hearing loss, and the degree of the particular plaintiff's hearing loss. Given these individualized factors, it contends that it was not reasonable to pay the same amount in settlement to all the plaintiffs. Continental also points out that Tate & Lyle's own counsel at one time recommended against this type of "one-size-fits-all" settlement approach.
Third, Continental argues that the manner in which the settlement of the first flight was accomplished demonstrates that it was unreasonable. Despite that it was still providing an unconditional defense to Tate & Lyle, the settlement was done without providing Continental with any information and without its input. Continental was not informed of the settlement until three weeks after it was reached. Indeed, the Rabalais Firm, instructed the plaintiffs' counsel to keep the settlement confidential.
Tate & Lyle, on the other hand, contends that the first flight settlement was reasonable given the following factors:
 It believed that it could not defeat liability. In April 2003, the Rabalais Firm advised it that "[c]onsidering all of the discovery conducted to date, we do anticipate that the plaintiffs will establish liability against the refinery" and that "if the plaintiffs established liability, we estimate that the damage awards will range between $40,000 and $50,000."
 It believed that it would be found liable for $50,000 per plaintiff  the jury trial threshold that the plaintiffs stipulated their individual claims did not exceed.
 A $50,000 damage award had already been upheld by a Louisiana appellate court in a hearing loss case to three hearing loss plaintiffs, including one that only had suffered mild to moderate hearing loss, Broussard v. Union Pacific R.R. Co., 29,768 to 29,770 (La. App. 2 Cir. 8/28/97), 700 So.2d 542.[22]
 It believed that it would be responsible for judicial interest.
 It believed that it would be liable for costs if the plaintiffs were awarded amounts in excess of their offers of judgment (which were between $35,000 and $39,000) by 25%.
 Its experts were unable to quantify or segregate the plaintiffs' hearing loss to causes other than their employment at its Arabi Refinery.
 It was incurring substantial costs in defending the case.
 It recognized that a judgment against it for the stipulated amount of $50,000 potentially would limit its ability to settle future hearing loss cases for less than that amount.
We find the above factors cited by Tate & Lyle, several of which were noted by the trial court in its reasons for judgment, *774 support the finding that the first flight settlement was reasonable. This finding is further supported by Continental's failure to voice an objection to the reasonableness of the first flight settlement in either the disclaimer of coverage letter that it sent to Tate & Lyle a week after the settlement or its answer to the third party demand.
(ii) second flight settlement
As discussed earlier, the second flight was settled in April 2005. At that time, Continental had resumed defending Tate & Lyle, albeit under a reservation of rights. By letter dated March 17, 2005, the Rabalais Firm recommended that Tate & Lyle offer to settle the second flight for $35,000 per plaintiff. By letter dated March 24, 2005, Continental informed Tate & Lyle of its objections to this recommendation. Continental indicated that the recommended settlement failed to "make a reasonable, individualized analysis of the claims and fail[ed] to take into account the significant legal defenses available to Tate & Lyle." Continental also objected because the proposed settlement figure  $35,000  was close to the plaintiffs' stipulated maximum recoverable damages of $50,000.
In its letter, Continental set forth a counter proposal. It proposed that individualized, reasonable offers be made to each of the second flight plaintiffs. If such offers were rejected, it proposed that the second flight be tried so that a record could be developed for purposes of taking an appeal, and the significant legal issues could be argued on appeal. Continental offered to limit Tate & Lyle's risk of taking the second flight to trial by agreeing to "indemnify Tate & Lyle for any amount in excess of $525,0000 [($35,000 for each of the fifteen second flight plaintiffs)] that result[ed] if the upcoming flight is tried and a judgment adverse to Tate & Lyle is rendered on that flight."[23]
At trial, Tate & Lyle's corporate representative, Ms. Claypool, explained the reasons why Tate & Lyle decided to reject Continental's counter proposal and to follow the Rabalais Firm's recommendation to settle the claims of the second flight. Characterizing it as a "business decision," Ms. Claypool testified:
Tate and Lyle looked at their potential liability. They looked at the legal costs, the expert costs, the costs of litigating this on a flight-by-flight basis. . . . [W]e paid out in excess of $1.5 million in costs, fees, expert costs, which was substantially more than we were paying in the settlement flights for the first two flights. We knew that our experts couldn't quantify the hearing loss. We could get hit with a $50,000 per claimant. Under the Broussard case, it would more than likely be sustainable on appeal. We had a huge risk factor with regard to our worker's comp exclusivity issue, because the circuits down here were split on that particular issue. There was potential for judicial interest. Things weren't getting any better for Tate and Lyle. They made a business decision that this was in our best interest. *775 And at this point in time Tate and Lyle was unaware whether they were going to have any contribution from [Continental] whatsoever, and had to make this decision based on the fact that it was Tate and Lyle's money.
In support of its contention that the settlement of the second flight was not reasonable, Continental relies on the following three factors. First, as with the first flight, it argues that there was no individualized analysis of the plaintiffs' claims. Second, although Continental did an individualized analysis of the plaintiffs' claims and provided it to Tate & Lyle and requested that they make individual settlement offers to the second flight plaintiffs, it argues that Tate & Lyle did so only after negotiating the global settlement of $35,000 per plaintiff. Third, as noted above, Continental offered to accept the risk of any judgment in favor of the second flight plaintiffs in excess of $35,000, but Tate & Lyle rejected that offer.
Tate & Lyle counters that its settlement with the second flight was reasonable given the following factors:
 After the first flight settlement, the plaintiffs amended their petition again to add more claimants and causes of action.
 Tate & Lyle perceived the plaintiffs' claims as getting stronger because the plaintiffs engaged a nationally known mass tort law firm to represent them, the plaintiffs were flown to Dallas for audiological testing, and the plaintiffs for the first time alleged special damages.
 The plaintiffs' amended petition demanded over $50,000 each in damages, and the second flight demanded in excess of $130,000 each to settle.[24]
 Tate & Lyle was not successful in its motions or writ applications on the legal issues.
 Tate & Lyle's experts were unable to absolve it of liability or segregate the plaintiffs' hearing loss among potential causes.
 Tate & Lyle's costs of defense to the time of the trial of the second flight (about $1.5 million) exceeded the amount it paid to settle the first two flights (about $1 million).
 Although Continental made an offer to cap Tate & Lyle's liability for the second flight at $35,000 per plaintiff, the offer was unacceptable to Tate & Lyle because it left it fully responsible for the remaining more than two hundred plaintiffs at a time when Continental was contesting coverage.
In finding the settlement of the second flight was reasonable, the trial court apparently found credible Ms. Claypool's testimony that the settlement was a "business decision." In its reasons for judgment, the trial court found that "Tate & Lyle was under no obligation to take the plaintiffs' action to trial and to risk having an adverse judgment taken against them in excess of the value of the settlements." Given these circumstances, we cannot say that the trial court erred in finding the settlement of the second flight was reasonable.
(iii) remaining plaintiffs' settlement
Continental's March 24, 2005 letter to Tate & Lyle also addressed the Rabalais Firm's recommendation that the claims of the remaining plaintiffs be settled by entering into a matrix settlement *776 agreement. Under that settlement agreement, each of the remaining plaintiffs that satisfied certain criteria would receive $35,000. In its letter, Continental stated that it had the same objections to the settlement of the remaining plaintiffs' claims as it had to the second flight settlement. Continental further stated that it had the following objections that related particularly to the settlement of the remaining plaintiffs' claims:
We believe such a proposal is not reasonable because full discovery has not yet been conducted on these claims, most of these claimants have not yet been deposed, and their claims are not yet ripe for a full evaluation. Indeed, Tate & Lyle has not been able to provide us with dates of employment for many of these claimants.
Tate & Lyle nonetheless followed the recommendation of the Rabalais Firm and settled the remaining plaintiffs' claims.
On appeal, Continental argues that Tate & Lyle paid over one hundred plaintiffs whom it did not owe because they did not meet the settlement criteria. Namely, it argues that Tate & Lyle improperly paid:
1. One plaintiff who did not meet the ten-year employment requirement and four plaintiffs who had no evidence that they had been employed for ten years;
2. Ten plaintiffs who did not meet the twenty decibels hearing loss requirement; and
3. One hundred and five plaintiffs who did not have a "qualified audiogram" as defined under the settlement criteria.
Continental contends that the settlements with the plaintiffs in these three categories were not owed and thus, by definition, not reasonable. See 14 Couch on Insurance 3d § 203.36.
Because neither the trial court (in its reasons for judgment or at trial) nor Tate & Lyle (in its post trial brief or appellate brief) addressed the first two categories of plaintiffs, we find it appropriate to allow Continental an opportunity on remand to have the trial court determine if these claims were legally owed by Tate & Lyle.
As to the third category of one hundred and five plaintiffs, Continental contends these plaintiffs were paid despite the lack of a "qualified audiogram." The argument Continental makes regarding the lack of a qualified audiogram does not go to the reasonableness of the settlement; rather, it goes to the implementation and interpretation of the settlement agreement. Continental's position is that under the terms of the settlement agreement defining a "qualified audiogram," the parties carefully considered the identity of the person conducting the audiogram. In particular, Continental relies on the following provision of the settlement agreement, which defines the term "qualified audiogram":
For purposes of this Agreement, the term "Qualified Domino Audiogram" means:
A. The audiogram was made within twelve months of the plaintiff's last date of employment with Domino; and
B. The audiogram was made with respect to a plaintiff who had a minimum of ten (10) years of employment at Domino's Arabi, Louisiana facility.
If there is no Qualified Domino Audiogram then the parties agree:
A. To compare the audiograms conducted by Dr. Michael Seidemann and David Mulnick and use the audiogram which has the better hearing result; or
B. If there is neither a Seidemann nor Mulnick audiogram to use for comparison purposes, but the plaintiff *777 is a present employee, then for purposes of this Agreement the parties agree to:
i. Use the audiogram that shows the better hearing between the last refinery audiogram and the plaintiffs pure tone audiogram taken by Occupational Medical Resources, Inc. ("OMR")
ii. If there is neither a Seidemann, Mulnick, last refinery audiogram for a present employee, nor an OMR audiogram to use for comparison purposes, then for purposes of this Agreement, the parties agree to use an audiogram taken by Dr. Michael Seidemann to determine if an individual meets the criteria set forth herein. The cost of this audiogram will be split by the parties to this Agreement.
Resolving the legal issue of the interpretation to be given to the terms of the settlement agreement, the trial court, agreeing with Tate & Lyle, held that the agreement allowed for the settlement of any remaining plaintiff who established the following two criteria: (i) at least ten years of employment at Tate & Lyle's Arabi refinery, and (ii) a hearing loss of twenty decibels or more as established by an audiogram. As Tate & Lyle emphasizes, all of the one hundred and five plaintiffs at issue satisfied both these criteria; they all had both ten years of employment and an audiogram showing at least twenty decibels of hearing loss before their last date of employment at the Arabi refinery.
In rejecting Continental's argument that the settlement agreement required more in terms of the particular type of audiogram, the trial court reasoned that Continental was seeking to impose its interpretation of the agreement and that "Continental's understanding of the settlement agreement is contrary to the principle of contractual interpretation in discerning the intent of the parties." See Duet v. Lucky, 621 So.2d 168 (La.App. 4th Cir.1993)(holding that an insurer lacked standing to raise the issue of the intent of the parties to the settlement agreement to which it was not a party); see also Sumrall v. Bickham, 03-1252 (La.App. 1 Cir. 9/8/04), 887 So.2d 73. For these reasons, the trial court rejected Continental's interpretation of the settlement agreement regarding the type of audiogram required.
The trial court's interpretation of the settlement agreement is supported by the testimony of Tate & Lyle's corporate representative, Ms. Claypool. She testified that her understanding as to the settlement criteria was that "[e]ach claimant would have to have . . . proof of ten years of service" and "also have to have an audiogram that showed at least a 20 dB loss or greater."
The trial court's interpretation is also supported by the conduct of the parties to the settlement agreement. See La. C.C. art. 2053 (providing that "[a] doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.") As this court has recognized, "[a] good way to determine what the parties to a contract intended is to look at the method in which the contract is performed, particularly if done consistently over and over again for a period of time." Barbe v. A.A. Harmon & Co., 94-2433, 94-2424, p. 15 (La.App. 4 Cir. 1/7/98), 705 So.2d 1210, 1220. In this case, Tate & Lyle and the plaintiffs consistently have interpreted the settlement agreement as allowing the settlement of the claim of any plaintiff having at least ten years of employment *778 and a hearing loss of twenty decibels or more.
Finding no error in the trial court's interpretation of the settlement agreement, we turn to Continental's argument regarding the reasonableness of the settlement of the remaining plaintiffs' claims. Continental argues, as it did with the other settlements, that Tate & Lyle failed to make an individualized analysis of any of the remaining plaintiffs' claims. It also argues that the settlement criteria were biased and skewed. It bases the latter argument on Dr. Seidemann's testimony that the settlement criteria were biased and skewed so as to lead to a finding of more severe hearing losses and thus to increase the number of plaintiffs qualifying for settlement. For this reason, Continental contends the settlements were not made in good faith. Tate & Lyle counters that the hearing loss criteria that were adopted as part of the settlement agreement were the result of a compromise between Tate & Lyle and the plaintiffs' counsel. Tate & Lyle also points out that Dr. Seidemann conceded at trial that he had no opinion as to Tate & Lyle's "potential liability," which is the relevant legal standard on which the settlements must be analyzed. It thus contends that Dr. Seidemann's testimony was irrelevant.
In finding the settlement with the remaining plaintiffs reasonable, the trial court stated in its reasons for judgment that "[t]he employment history of ten (10) years coupled with a twenty (20) decibel hearing loss established through qualifying audiograms are a sound and reasonable basis to satisfactorily conclude over two hundred (200) Plaintiff hearing loss cases." As noted earlier, the trial court found the global settlement of all these claims to be reasonable under the facts of this case. The trial court further found that "the settlements were entered into after a full investigation of each of the cumulated Plaintiff cases." Given the circumstances of this particular case, which at the time of the settlement of the remaining plaintiffs' claims had been pending for over six years with substantial judicial interest accumulating, we cannot say that the trial court's finding that the settlement was reasonable is erroneous.[25]

PROFFER
Continental assigns as error the trial court's refusal to allow it to make proffers of evidence excluded at trial or to supplement the record with such evidence. Tate & Lyle counters that any evidentiary error resulting from the trial court's refusal to allow Continental to proffer excluded evidence was harmless.
The governing procedural provision on evidentiary proffers is La. C.C.P. art. 1636, which provides that "[w]hen the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence." La. C.C.P. art. 1636(A). Although the trial court has discretion regarding the form of proffer it allows, the trial court has no discretion regarding allowing a proffer. Gulf Outlet Marina, Inc. v. Spain, 02-1589, p. 10 (La.App. 4 Cir. 6/25/03), 854 So.2d 386, 392. Indeed, the purpose of mandating the trial court to allow the excluded evidence to be proffered is so that "the testimony (whatever its nature) is available for appellate review." *779 McLean v. Hunter, 495 So.2d 1298, 1305 (La.1986).
In its brief, Continental cites only two instances in which the trial court refused to allow it to make a proffer during the trial. The first instance occurred during the testimony of its corporate representative, Mr. Caswell. When the trial court refused to allow Mr. Caswell to testify regarding the specific prescription defenses related to particular plaintiffs, Continental sought to proffer this testimony. In refusing to allow the proffer, the trial court ruled that the evidence was "of no value, not even to a reviewing court." The other instance Continental cites occurred during the testimony of Tate & Lyle's sole witness, Ms. Claypool, regarding discussions about cost-sharing arrangements with Tate & Lyle's other insurers. In refusing to allow Continental to proffer Ms. Claypool's prior sworn statement as impeachment evidence, the trial court stated that there had not been "any decree of any evidence being held inadmissible." Moreover, the trial court later explained that it did not believe there was any conflict in the testimony and that the cross-examination of this witness was being "directed at a way of just exchanging words without a difference in meaning." In refusing to allow the proffer of Ms. Claypool's sworn statement, the trial court also ruled that the evidence was not relevant.
Although the trial court's rulings denying Continental's requests to proffer were erroneous, we find, as Tate & Lyle suggests, that a form of harmless error analysis governs this issue. See Fernandez v. Pizzalato, 04-1676, p. 19 (La.App. 4 Cir. 4/27/05), 902 So.2d 1112, 1124 (finding violation of La. C.C.P. art. 1636 requirement that proffer be allowed was harmless error because other evidence of the arrest record was already in the record). The effect of an erroneous evidentiary ruling is governed by La. C.E. art. 103, which provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." La. C.E. art. 103. The concept of "substantial right" as used in Article 103 is "a kin to the familiar `harmless error' doctrine applicable in both civil and criminal matters." George Pugh, Robert Force, Gerald Rault, Jr. and Kerry Triche, Handbook on Louisiana Evidence Law, p. 300 (2006 Ed.). The jurisprudence has "properly taken the view that the risk of prejudice is often less likely in a bench trial than in a jury trial." Id.
In this case, we cannot say that any substantial right of Continental was violated by the trial court's exclusion of the evidence it sought to proffer on these two instances it identifies. As to Mr. Caswell's testimony regarding prescription, the record, as Tate & Lyle points out, contains other evidence on the prescription issue. Indeed, the trial judge was presented with an exception of prescription as to certain plaintiffs. As to Ms. Claypool's testimony regarding discussions about cost-sharing arrangements with Tate & Lyle's other insurers, it is undisputed that no cost-sharing arrangement was ever reached. Although we find under the circumstances of this particular case that these evidentiary errors were harmless, we note that judicial economy is better served by the trial court following the mandate of article 1636 and allowing the parties to proffer the evidence so that it is available for appellate review.

BAD FAITH PENALTY
Although Tate & Lyle's third party demand sought penalties under both La. R.S. 22:658 and La. R.S. 22:1220, the trial court awarded penalties under only Section 658. Continental contends that the trial court erred not only in imposing penalties, but *780 also in retroactively applying the 2003 amendment to Section 658 increasing the penalty rate from ten to twenty-five percent. See 2003 La. Act. No. 790 (effective August 15, 2003).
At the outset, we address the question of statutory interpretation regarding which version of Section 658 is applicable in this case. As noted, the trial court applied the amended version of the statute. Both parties concede that this was a substantive amendment that cannot be retroactively applied. See Gulf Wide Towing, Inc. v. F.E. Wright (U.K.) Ltd., 554 So.2d 1347 (La.App. 1st Cir.1989). Both parties also cite Manuel v. Louisiana Sheriff's Risk Management Fund, 95-0406 (La.11/27/95), 664 So.2d 81, as supporting their position on this issue. Continental's position is that because the events triggering its duty to defend  the filing of the underlying hearing loss suit (February 1999), the alleged breach of its duty to defend by withdrawing its defense (June 2003), and Tate & Lyle's filing of the third party demand (July 2003)  occurred before the effective date of the amendment (August 2003), the trial court erred in applying the amended version of the statute. Tate & Lyle's position is that the triggering event giving rise to its bad faith claim is Continental's failure to pay the defense costs within thirty days after the trial court's grant of partial summary judgment (October 2004). Because this event occurred after the effective date of the amendment (August 2003), Tate & Lyle contends the trial court correctly applied the amended version of the statute.
In Manuel, the issue was whether it would constitute an improper retroactive application of La. R.S. 22:1220 to apply the newly enacted statute when the policy was issued and the accident occurred before its effective date, but the insurer's conduct triggering the penalty occurred after the effective date.[26] Finding it would not, the Louisiana Supreme Court reasoned that under these circumstances the statute was being applied only prospectively and that "[i]t is of no consequence that the insurance policy and the accident pre-date the statute, since the conduct which exposes the defendants to liability occurred after the statute became law." Manuel, 95-0406 at p. 11, 664 So.2d at 87. As Continental contends, the Supreme Court distinguished the facts before it from those presented in cases in which both the accident and the insurer's conduct occurred before the effective date of the statute. See Federal Ins. Co. v. St. Paul Fire and Marine Ins. Co., 93 0555 (La.App. 1 Cir. 3/11/94), 634 So.2d 40, and Jeffries v. Estate of Pruitt, 93 1442 (La.App. 1 Cir. 6/24/94), 638 So.2d 723.[27]
Manuel instructs that the proper focus for determining which version of a penalty provision applies is the date of the alleged bad faith. Contrary to Tate & Lyle's argument, the trial court's grant of partial summary judgment on the employee exclusion did not resolve the coverage issue entirely. Continental had denied coverage for any bodily injury that did not take place during one of its policy periods. Continental, therefore, was not in bad faith at that point so that there was no act of bad faith after the effective date of the *781 amended version of the statute, and the pre-amendment version is applicable to this claim.
In addressing the issue of whether the trial court erred in imposing penalties, it is necessary to divide the penalty award into two components: (i) the award for failure to timely pay defense costs, and (ii) the award for failure to timely pay the settlements. Before addressing these two components of the penalty award, we briefly outline the applicable principles.
The prohibited conduct under La. R.S. 22:658 is "the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause." Reed v. State Farm Mut. Auto. Ins. Co., 03-0107, p. 12 (La.10/21/03), 857 So.2d 1012, 1020 (citing Calogero v. Safeway Ins. Co. of Louisiana, 99-1625, p. 7 (La.1/19/00), 753 So.2d 170, 174). Because Section 658 is penal in nature, it is strictly construed. Reed, 03-0107 at pp. 12-13, 857 So.2d at 1020 (citing Hart v. Allstate Ins. Co., 437 So.2d 823, 827 (La.1983)). The claimant seeking to recover under Section 658 bears the burden of establishing three things: (i) that the insurer received a satisfactory proof of loss, (ii) that the insurer failed to pay the claim within the applicable statutory period, and (iii) that the insurer's failure to pay was arbitrary and capricious. Boudreaux v. State Farm Mut. Auto. Ins. Co., 04-1339, p. 4 (La.App. 4 Cir. 2/2/05), 896 So.2d 230, 233 (citing Sterling v. U.S. Agencies Cas. Co., 01-2360, p. 6 (La.App. 4 Cir. 5/15/02), 818 So.2d 1053, 1057). A satisfactory proof of loss is a necessary predicate to a showing that the insurer was arbitrary and capricious. Reed, 03-0107 at p. 13, 857 So.2d at 1021; Friedmann v. Landa, 573 So.2d 1255, 1260 (La.App. 4th Cir.1991). If "there is a reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits." Reed, 03-0107 at p. 13, 857 So.2d at 1021 (citing Block v. St. Paul Fire & Marine Ins. Co., 32,306, p. 7 (La.App. 2 Cir. 9/22/99), 742 So.2d 746, 751).
The determination as to whether an insurer's refusal to pay is arbitrary, capricious, or without probable cause hinges on the facts of which the insurer was aware of at the time it acted. See Reed, 03-0107 at p. 14, 857 So.2d at 1021. A trial court's determination that an insurer's handling of a claim was arbitrary, capricious, or without probable cause is thus a factual finding that may not be disturbed on appeal absent manifest error. Reed, 03-0107 at p. 14, 857 So.2d at 1021 (citing Scott v. Insurance Co. of North America, 485 So.2d 50, 52 (La.1986)); Calogero, 99-1625 at p. 5, 753 So.2d at 173 (citing Brinston v. Automotive Cas. Ins. Co., 96-1982 (La.App. 4 Cir. 12/3/97), 703 So.2d 813, 816).
(i) settlement awards
The trial court's reasons are silent as to why a penalty was imposed on the settlement awards. Continental contends that the trial court's imposition of a penalty on these settlement awards was improper given that it had a reasonable and legitimate question as to the extent of Tate & Lyle's claim for indemnification of the settlement awards. We agree. Continental's contention that all of the settlements were unreasonable and that it did not waive its right to enforce its policy term were reasonable and legitimate questions that it had the right to litigate without being found in bad faith. See Reed, supra. As Continental points out, it also is arguable that Tate & Lyle never submitted to Continental a proof of loss as to these settlement awards. Indeed, even at the time *782 of trial Tate & Lyle had not finished providing the documentation for all of the settlements. Thus, the statutory time limit would not have commenced to run as to those settlements.
Although Tate & Lyle argues that Continental's failure to pay at least its pro rata share of the first flight settlement award supports a finding of bad faith, this argument ignores the legitimate questions Continental raised regarding the reasonableness of that settlement and the scope of the waiver of its policy defenses. For these reasons, we conclude the trial court was manifestly erroneous in imposing a bad faith penalty on the settlement awards.
(ii) defense costs
The trial court reasons for judgment focus solely on the penalty award for Continental's failure to pay defense costs. The basis for this award is Continental's failure to pay the defense costs within thirty days from when Tate & Lyle submitted the costs to it. The record reflects that by letter dated November 11, 2004, Tate & Lyle first submitted the defense costs to Continental. In that letter, Tate & Lye's counsel submitted to Continental invoices documenting that it had spent to date "in excess of $1.3 million in defense of the Arceneaux matter." The letter cites the trial court's then recent October 29, 2004 judgment granting Tate & Lyle's motion for partial summary judgment as the basis for Continental's obligation to reimburse Tate & Lyle for these past defense costs. The letter further cites the principle that under Louisiana law an insurer is required to defend the entire suit if any one claim is potentially within coverage. See Ellis v. Transcontinental Ins. Co., 619 So.2d 1130, 1134 (La.App. 4th Cir.1993). It is undisputed that Continental did not pay any of the defense costs until April 6, 2005.
In imposing penalties, the trial court reasoned as follows:
[I]t is important to recall that the first flight settlement occurred in May, 2003. Continental provided a defense to Tate and Lyle for approximately four (4) years and gave its denial of coverage notice on June 6, 2003. Tate and Lyle filed this Third Party Demand against Continental on July 11, 2003 and obtained a judgment in its favor thereon on a Motion for Summary Judgment decided on October 2[9], 200[4], including the ordering of the reimbursement of defense costs.[28] Defense costs were paid by Continental to Tate and Lyle on March 4, 2005.
Continental attributes the delay in reimbursing the defense costs to the prospect of engaging in pro-rata cost sharing with the other insurer in Cole/Southern Norfolk scenario discussed earlier herein. Similarly, Continental's reliance on such a cost sharing arrangement is misplaced. This matter is distinguished as a "waiver" case. Further, Continental had filed a third party action against the other insurers for reimbursement of defense costs which is pending. In any case, this Court's directive to pay defense costs languished for several months. Continental contends the delay was caused by the tardy submission and verification of those costs by Tate and Lyle.
Rejecting Continental's defenses, the trial court awarded bad faith penalties on the defense costs.
On appeal, Continental contends that there is no express provision in the trial *783 court's earlier judgment ordering it to pay defense costs. As Continental puts it, "[the judgment] contained no directive that Continental reimburse the entirety of Tate & Lyle's defense costs and did not address what percentage of defense costs Continental was required to pay." Our review of the record reveals that Continental's contention is correct. Although the trial judge at the beginning of the trial referred to its earlier judgment as having such a directive, the trial court's October 29, 2004 judgment is silent on the issue. However, in the trial court's April 1, 2005 reasons for judgment denying the parties' cross motions for summary judgment, the trial court explains that "[t]he prior [October 29, 2004] judgment recognized the right of Tate & Lyle to recover past defense expenses." Indeed, Tate & Lyle's earlier motion for partial summary judgment sought a declaration on both the waiver and duty to defend issues. Moreover, Continental's corporate representative, Mr. Caswell, acknowledged at trial that the October 2004 judgment extended to both the waiver and duty to defend issues.
Although the amount Tate & Lyle demanded in November 2004 admittedly was incorrect in that it included fees for an unrelated matter, Continental made no payment of any of these defense costs until April 2006. During the interim, Continental offered to pay Tate & Lyle a pro rata share of the defense costs.[29] Continental also unsuccessfully engaged in discussions regarding cost sharing with Tate & Lyle's other insurers.
In February 2005, Continental made a conditional offer to pay all past defense costs. That offer was documented in an e-mail dated February 21, 2005 that Continental's counsel sent to Tate & Lyle's counsel. The e-mail stated that "[Continental] offered to pay all past defense costs, and all reasonable future defense costs so long as we could hire additional counsel to defend Tate & Lyle. Tate & Lyle would waive its bad faith claim, and Tate & Lyle would assist us in pursuing other carriers for defense."
In March 2005, Continental committed to pay all past defense costs. After doing so, Continental analyzed the bills that Tate & Lyle had submitted to it and determined that the bills included amounts unrelated to this case. On March 24, 2005, Tate & Lyle agreed that the previous bills included amounts related to other matters and advised Continental of the correct amount owed. Also on that date, Tate & Lyle submitted additional defense bills totaling $46,790.05.
On April 6, 2005, Continental issued a check to Tate & Lyle for $1,419,168.95, which covered all past defense costs that Tate & Lyle had submitted to it.
Given the above chronology of events, we cannot say the trial court was manifestly erroneous in finding Continental was in bad faith insofar as its failure to pay any of the defense costs until April 2006. We, however, do find merit to Continental's contention that the trial court erred in including in the defense costs to which the ten percent penalty applies the additional bills totaling $46,790.05 that Tate & Lyle submitted on March 24, 2004. Because these additional bills were paid within thirty days (on April 6, 2005), the trial court was manifestly erroneous in including these bills in calculating the penalty. We thus affirm the award of bad *784 faith penalties on the defense costs, but amend the award to exclude from the calculation the defense costs that were timely paid.

PRE-JUDGMENT INTEREST
Continental contends that the trial court erred in imposing pre-judgment interest from the date of Tate & Lyle's third party demand (July 11, 2003) on both the penalty award and the indemnity award for the two hundred and two settlements that were not entered into until 2005 and not paid until thereafter. We separately address the interest issue Continental raises as to each of these awards.
(a) penalty award
Continental contends that interest on the penalty award should have been imposed only from the date of the trial court's judgment. In support it cites Becnel v. Lafayette Ins. Co., 99-2966 (La.App. 4 Cir. 11/15/00), 773 So.2d 247, which held that such penalties are unliquidated until a judgment is rendered and that interest cannot run before judgment is rendered. It also cites Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382, for the proposition that interest on penalties runs only from the date of judgment.
Although Tate & Lyle acknowledges that Sharboro and Becnel hold that interest on penalties runs from the date of judgment, it contends that this court has awarded interest on bad faith penalties from the date of judicial demand. Sanderford v. Lombard, 96-1171, pp. 6-7 (La. App. 4 Cir. 12/11/96), 685 So.2d 1162, 1167; Daney v. Haynes, 630 So.2d 949, 955 (La. App. 4th Cir.1993). Tate & Lyle contends that Sanderford and Daney stand for the proposition that when proof of a claim is received before suit is filed, interest on penalties begins to run from the date of judicial demand. In this case, Tate & Lyle contends that the trial court correctly awarded interest on the La. R.S. 22:658 penalty from the date of judicial demand since Continental received proof of the first flight settlements in May 2003, which was before the filing of the third party demand in July 2003.
Although the Supreme Court in Sharbono hinted that interest on all penalties runs only from the date of judgment, the principal holding in Sharbono was that interest on attorney's fees runs from the date of judgment because the amount of those fees cannot be determined until the judgment is rendered. As Tate & Lyle points out, this court has allowed interest on bad faith penalty awards form the date of judicial demand. As a commentator has noted, "while other circuits permit interest only from date of judgment, the Fourth Circuit permits interest from the date of judicial demand for a pre-demand breach." McKenzie & Johnson, § 131. The contrary holding in the Becnel case was based on the plaintiff-insured's acknowledgement that the Second Circuit's holding in Holt v. Aetna Cas. & Sur. Co., 28,450 (La.App. 2 Cir. 9/3/96), 680 So.2d 117, "correctly sets forth the law on prejudgment interest on penalties and attorney's fees" that interest runs from the date of judgment. Becnel, 99-2966 at 14, 773 So.2d at 254. The rule in this circuit, however, remains that interest on a bad faith penalty award runs from the date of judicial demand, at least when proof of a claim is received before suit is filed. See Nicholson v. Transit Management of Southeast Louisiana, 00-0706, p. 1 (La.App. 4 Cir. 2/14/01), 781 So.2d 661, 673 (Tobias, J., concurring)(noting that judicial interest on penalties runs from the date of judicial demand). Since Continental had proof of Tate & Lyle's claim before the third party demand was filed, the trial court did not err in awarding pre-judgment *785 interest on the bad faith penalty award from the date of judicial demand.
(ii) 2005 settlements
Continental contends that the award of pre-judgment interest on the 2005 settlements is inconsistent with the jurisprudence addressing the accrual of interest when part of the contractual breach occurs after the date of judicial demand. In support it cites Miller v. Louisiana Gas Service Co., 95-874 (La.App. 5 Cir. 6/25/96), 680 So.2d 52; and City of New Orleans v. United Gas Pipe Line Co., 517 So.2d 145 (La.App. 4th Cir.1987). Continental further contends that the trial court's award of interest on the 2005 settlements from the date of the July 2003 judicial demand is, in essence, a penalty award and thus is inconsistent with the compensatory purpose of prejudgment interest. See Trans-Global Alloy Ltd. v. First Nat'l Bank of Jefferson Parish, 583 So.2d 443 (La.1991). We agree. The interest on these settlement awards should not begin to accrue until the date Tate & Lyle paid these amounts, giving rise to an indemnity obligation on Continental's part. See Miller, surpa (holding that because an indemnitor is not liable until the indemnitee actually makes payment, interest does not accrue until the payment is made); see also United, 517 So.2d at 165 (holding that the "fair computation of interest requires that the damages for the excess alternative fuel costs [which were not ascertainable on the date of judicial demand] . . . be deemed to become due only at the time that those costs were incurred.")
Attempting to distinguish these cases, Tate & Lyle argues that this is a tort suit in which Continental was joined as a direct defendant; thus, interest on an award against Continental is due from the date of judicial demand. See Edwards v. Daugherty, 03-2103, pp. 23-24 (La.10/1/04), 883 So.2d 932, 947 (stating that "[a]ll liability carriers owe interest on judgments in tort cases . . . from the date of judicial demand.") This argument, as Continental contends, overlooks that the present dispute is solely a contractual dispute between Tate & Lyle and Continental. See Corbello v. Iowa Production, 02-0826, p. 29 (La.2/25/03), 850 So.2d 686, 706 (holding that "[u]nlike judgments in ex delicto actions wherein judicial interest attaches from judicial demand, interest is recoverable on debts arising ex contractu from the time they become due, unless otherwise stipulated.") For these reasons, we modify the award of interest on the 2005 settlements to provide that interest is due on such amounts only from the date on which Tate & Lyle made payment of such settlement awards.

DECREE
For the foregoing reasons, the following findings of the trial court are reversed: (1) the extension of Continental's waiver to the claims of the post-denial plaintiffs; (2) the finding that the 2003 amendment to La. R.S. 22:658 applies in this case; and (3) the award of La. R.S. 22:658 penalties on the settlement awards. The judgment of the trial court is modified in the following two respects: (1) the amount on which the La. R.S. 22:658 penalty award on the defense costs is calculated is modified to exclude $46,790.05 in defense costs that were paid within thirty days of the tender, and (2) the award of interest on the 2005 settlement awards is modified to provide that interest is due on such awards only from the date on which Tate & Lyle made payment of such awards. This case is remanded to the trial court for two reasons: (1) for a determination of whether the fifteen plaintiffs identified earlier in this opinion satisfied the settlement criteria; and (2) for a recalculation of the amounts due consistent with the findings *786 set forth herein. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED IN PART, MODIFIED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] The petition initially named as defendants Amstar Corporation; Amstar Sugar Corporation; Tate & Lyle North American Sugars, Inc.; and Domino Sugar Company. The Second Supplemental and Amending Petition inexplicably refers to the originally named defendant as Amstar Corp. Sugar Refinery f/k/a Domino Sugar Refinery f/k/a American Sugar Refinery and amends the defendant's name to read "Tate & Lyle North American Sugars, Inc. f/k/a Tate & Lyle f/k/a Amstar Sugar Refinery f/k/a American Sugar Refinery." For ease of reference, we refer to the defendant as "Tate & Lyle."
[2] Although the first flight initially included eighteen plaintiffs, there were only fifteen plaintiffs remaining when the trial commenced.
[3] Tate & Lyle's other insurers previously had issued a reservation of rights declaration.
[4] Continental later stipulated that there was a mistake in the letter in that it failed to recognize that the employee exclusion had been removed by endorsement for the final twenty-six months of its last policy  from December 31, 1975 to March 1, 1978.
[5] Tate & Lyle filed an amended Third Party Demand asserting a claim for penalties under La. R.S. 22:1220. However, as noted elsewhere, the trial court awarded penalties only under La. R.S. 22:658.
[6] This petition also added as defendants various Tate & Lyle executive officers. In response, the defendants unsuccessfully attempted to remove this matter to federal court.
[7] Although the third amending petition alleged that the plaintiffs' damages exceeded $50,000, the plaintiffs subsequently stipulated before the settlement of the second flight that their damages did not exceed the $50,000 jury trial threshold.
[8] Due to personal illness, Ms. Graft's deposition testimony was presented in lieu of her live testimony.
[9] Although the trial court states in its reasons for judgment that settlement documents were secured from "218 of the 225" plaintiffs, the trial court apparently included in that number the settlement with one plaintiff that the trial court determined was not qualified. The correct number of plaintiffs for whom the trial court's judgment awarded indemnification was thus two hundred and seventeen (217).
[10] The amended judgment was entered to correct an error in the original judgment regarding the amount of the indemnification award. Although the original judgment awarded $7,350,000 (200 times $35,000) in indemnity, the amended judgment awards $7,595,000 (217 times $35,000). The difference in the amounts, as the trial court explained, was due to its error in counting the severed plaintiffs twice in determining the number of plaintiffs for whom indemnification was owed. (The severed plaintiffs were those who had died during the litigation. As to these plaintiffs, a determination had to be made regarding their legal successors' entitlement to be paid the settlement awards.) The amended judgment also corrects the calculation of the penalty award. Although the parties have not assigned as error the trial court's amendment of the judgment, we note that whether this type of correction of the judgment is within the scope of the "errors of calculation" allowed for under La. C.C.P. art. 1951 is questionable.
[11] On April 6, 2005, Continental paid Tate & Lyle $1,419,168.95 for reimbursement of defense costs that it had incurred in this suit. It did so under a full reservation of rights.
[12] As noted, we affirmed that decision in Arceneaux I, and it became a final judgment in January 2006.
[13] For ease of reference, we use the phrase "policy period" to refer to the multiple policy periods covered by Continental's policies at issue in this case.
[14] The policy at issue in Brister's was a "claims made" policy, which covered only those claims asserted with the policy period.
[15] See Sims v. Liberty Mut. Ins. Co., 04-584, p. 20 (La.App. 3 Cir. 3/2/05), 897 So.2d 834, 845 (holding that "policy limits are not a defense to coverage" and that "[p]olicy limits define the amount of coverage.")(citing Gambino v. Lamulle, 97-2798, p. 5 (La.App. 4 Cir. 6/10/09), 715 So.2d 574, 576 (holding that a waiver argument was not available because "[t]he dispute is over the amount of coverage" and not a policy defense that could be waived.))
[16] Tate & Lyle argues that procedurally, Continental should not be allowed to raise this issue on appeal because Continental failed to timely appeal the trial court's pretrial ruling, which held that the second and third amended and supplemental petitions related back to the first amended petition. We reject this argument because it is based upon the procedural law that existed before the 1997 repeal of La. C.C.P art. 966(F), which had provided that summary judgment could be rendered on the issue of insurance coverage alone. See Roundtree v, New Orleans Aviation Bd., 04-0702, p. 10 (La.App. 4 Cir. 2/4/05), 896 So.2d 1078, 1086. Thus, prior to 1997, a partial summary judgment awarding declaratory relief on the issue of insurance coverage could be considered to be a final, appealable judgment. See Fulton v. Blue Cross of Louisiana, 563 So.2d 492, 495 (La.App. 4th Cir.1990). However, the same 1997 legislative act that repealed article 966(F) also amended La. C.C.P. art. 1915 relative to partial summary judgments. Under the current version of article 915, a partial summary judgment is not appealable unless the trial court certifies it as final. Therefore, under the current procedural law, the trial court's pretrial ruling regarding the application of the relation back theory to the waiver issue, even if such ruling was considered to be a partial summary judgment, was not immediately appealable because the trial court did not certify it as final under article 1915.
[17] La. C.C.P. art. 1153 provides that "[w]hen the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing of the original pleading." La. C.C.P. art. 1153.
[18] In support of this ruling, Tate & Lyle cites a line of jurisprudence extending the relation back theory, which is ordinarily applied to interrupt prescription, to the pre-judgment interest context. See Cole v. Celotex Corp., 599 So.2d 1058, 1082 (La.1992); Trentecosta v. Beck, 00-0860, p. 6 (La.App. 4 Cir. 5/2/01), 786 So.2d 885, 889; Rivard v. Petroleum Transport Co., 95-0431 (La.App. 4 Cir. 9/28/95), 663 So.2d 755; Hackman v. Southern Farm Bureau Ins. Co., 93-513 (La.App. 5 Cir. 12/15/93), 629 So.2d 531, 538.
[19] See Thomas v. Mobil Oil Corp., 02-1904, pp. 3-5 (La.App. 4 Cir. 3/19/05), 843 So.2d 504, 506 (noting that "[c]umulation under Article 463 is a procedure pursuant to which several plaintiffs may sue several defendants in the same proceeding and have all their claims resolved. In a cumulated action each plaintiff presents a case and each defendant responds.")
[20] While this Court rejects Tate & Lyle's relation back theory, this is not to say that there may not be some instances where the prejudice occasioned by an earlier waiver so permeates the litigation that equity would require that the waiver in the earlier cases be deemed to extend to any subsequently filed cases arising out of the same operative facts. Failure to advise an insured of the intent to raise certain defenses, particularly those relating to the conduct of the insured, could result in the insured taking positions in earlier litigation that prove detrimental to its coverage positions in later filed cases arising out of the same general facts. However, the coverage defenses raised with respect to the post-denial cases at bar do not involve the sorts of issues that would give rise to such concerns, focused as they are solely on the dates of exposure of the particular claimant(s). Having been advised of Continental's intent to raise coverage defenses as to the post-denial plaintiffs at the outset of those cases, Tate & Lyle was not deprived of any opportunity to protect its interests in defending those claims.
[21] Tate & Lyle contends that Continental never challenged the amount of these settlements. However, Continental counters that its offer to pay Tate & Lyle a total of $50,000 for the settlement of the first flight was based, in part, on its belief the settlement amount was unreasonable. Continental further points out that its later offer in January 2005 to pay $185,000 towards the first flight settlement was made after the trial court's October 2004 decision on the waiver issue.
[22] The Broussard case involved three brothers who sustained hearing loss due to working conditions.
[23] Continental's proposal also included an agreement to pay its pro rata share, based on exposures within its fifteen year policy period (1963 to 1978), of a "reasonable settlement or judgment" as to pre-denial plaintiffs. As to post-denial plaintiffs, it agreed to pay its pro rata share, based on exposures within the period during which it stipulated that it had no employee exclusion in effect (from January 1, 1976 to March 1, 1978) of a "reasonable settlement or judgment." Continental also agreed to pay Tate & Lyle's past defense costs and its reasonable ongoing defense costs. As discussed elsewhere in this opinion, Continental's letter also addressed and objected to the Rabalais Firm's similar recommendation with regard to settling the claims of the remaining plaintiffs by entering into a matrix settlement.
[24] The plaintiffs stipulated before the settlement of the second flight that their individual damages did not exceed $50,000.
[25] However, as noted above, we remand to allow evidence regarding whether the fifteen plaintiffs, identified above, satisfied the settlement criteria. The narrow issue on remand will be whether these plaintiffs meet the settlement criteria as interpreted by the trial court and affirmed by this court.
[26] The prohibited conduct under La. R.S. 22:1220 and La. R.S. 22:628 is virtually identical. The primary difference between these statutes is the time periods allowed for payment  thirty versus sixty days. Boudreaux v. State Farm Mut. Auto. Ins. Co., 04-1339, pp. 3-4 (La.App. 4 Cir. 2/2/05), 896 So.2d 230, 233.
[27] We further note, as Continental points out, that Manuel did not involve an insurer's duty to defend.
[28] Although the trial court refers to that judgment as issued on October 23, 2003, the actual date of the trial court's earlier judgment is October 29, 2004.
[29] Continental contends this offer was reasonable based on the Cole case. As Continental points out, the Louisiana Supreme Court in the Cole case relied upon Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980), in which it was recognized that a pro-rata allocation could apply to defense costs.